UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

---------------------------------------------------------x
In re                                          :        Chapter 11
                                               :
THE JOLT COMPANY, INC.,                        :        Case No. 09-22531
                                               :
                    Debtor.                    :        Judge John C. Ninfo, II
---------------------------------------------------------x

**MOTION OF DEBTOR AND DEBTOR IN POSSESSION FOR THE ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING SECURED POST-PETITION FINANCING, (B) GRANTING SENIOR PRIMING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (C) PROVIDING ADEQUATE PROTECTION; (D) GRANTING LIMITED RELIEF FROM THE AUTOMATIC STAY, (E) SCHEDULING A FINAL HEARING, AND (F) GRANTING RELATED RELIEF**

The above-captioned debtor and debtor in possession (the "Debtor") hereby moves for the entry of interim and final orders pursuant to sections 105, 362 and 364 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (i) Authorizing Secured Post-Petition Financing, (ii) Granting Senior Priming Liens And Superpriority Administrative Expense Status, (iii) Providing Adequate Protection; (iv) Granting Limited Relief From The Automatic Stay, (v) Scheduling A Final Hearing, and (vi) Granting Related Relief (the "Motion"). In support of this Motion, the Debtor relies on *Affidavit of Robert Clamp in Support of First Day Motions* (the "Clamp Affidavit"), which has been filed simultaneously herewith and which is hereby incorporated by reference, and respectfully represents as follows:

## Statement Pursuant to Federal Rule of Bankruptcy Procedure 4001

### Summary of Terms

| | |
|---|---|
| Borrowing Limit: | $1,000,000 (plus use of cash collateral) |
| Interest Rate for the DIP Financing: | 15% per annum |
| Maturity Date of the DIP Financing: | December 31, 2009 |
| Events of Default: | Failure of Debtor to file Sale Motion on Petition Date or to obtain hearing on Sale Motion on or before Date that is sixty-five (65) days following the Petition Date and other customary events of default for a transaction of this nature (payment default, cessation of business, conversion of case). |
| Grant of Liens to Lender: | Senior lien on Post-Petition Collateral other than Post-Petition Accounts Receivable; senior lien on Pre-Petition Collateral, other than Pre-Petition Accounts Receivable; senior, priming Lien on Pre-Petition Collateral in respect of Liens in favor of third parties other than EBCC; claims with superpriority over administrative expenses; all Liens subject to professional fee Carve-Out. |
| Adequate Protection: | EBCC will receive a first priority Lien on Post-Petition Accounts Receivable. EBCC will also receive a replacement lien to the same extent, validity, and priority as it had prior to the Petition Date plus interest-only payments on its prepetition debt and a senior lien on all Chapter 5 Claims. Rexam will be provided with a replacement lien to the same extent and priority as Rexam had prior to the Petition Date. |

### Jurisdiction

1.      This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## General Background

### A. The Chapter 11 Case

2. Simultaneously herewith (the "Petition Date"), the Debtor has filed with this Court its voluntary petition for relief under chapter 11 of the Bankruptcy Code. Pursuant to Sections 1107 and 1108 of the Bankruptcy Code, the Debtor is continuing to operate its business and manage its properties and assets as debtor in possession. No trustee, examiner or committee of creditors has yet been appointed in this chapter 11 proceeding.

### B. The Debtor's Business

3. The Debtor, which also conducts business as Wet Planet Beverages, was created in 1985 by C.J. Rapp. When the Debtor was introduced over 20 years ago, it was the pioneer in the energized beverage category, which has served as the foundation for its rich brand equity. The media attention surrounding Jolt Cola's 1985 introduction catapulted the brand into national awareness, as Jolt Cola captured the imagination of taste-makers, musicians and the entertainment industry. Within weeks of launch, Jolt Cola appeared on the David Letterman Show and was featured in USA Today, positioning Jolt Cola as an icon for energy-fueled lifestyles. The extensive media coverage made quite an impression with consumers and, soon, drinking one's first Jolt Cola became a rite of passage for young Americans. Among independent mid-sized energy brands, Jolt Cola is the longest lived, preeminent privately held brand in the $4.9 billion energy drink category.

4. Currently the Debtor's products are sold throughout the United States, Canada and Europe. The Debtor sells its product directly to four leading retailers that provide over 12,000 points of sale through their national chain stores. The Debtor also utilizes a network of distributors reaching approximately 25,000 retail locations in the United States and Canada.

5. The Debtor's officers include Robert Clamp, Katherine Butkevich, C.J. Rapp, and Lowell Patric.

6. Mr. Clamp joined Jolt as its Chief Executive Officer ("CEO") in February of 2009. Mr. Clamp is currently also employed by the Boylan Bottling Company ("Boylan") under a Cost Sharing Agreement between Jolt and Boylan (the "Sharing Agreement"). Mr. Clamp has 29 years experience in the food and beverage industry, having previously served as the CEO of the Really Cool Food Company and also as senior manager for Nestle Waters North America, the Coca Cola Company and Proctor & Gamble. Mr. Clamp earned his Bachelor of Arts Degree in economics from Denison University.

7. Ms. Butkevich joined Jolt in 2009, also pursuant to the Sharing Agreement, where she serves as The Debtor's Chief Financial Officer ("CFO"). Prior to joining Debtor, Ms. Butkevich was a Vice President at Emigrant Capital, and a Senior Vice President of Finance and Treasurer of Medsite, a venture backed pharmaceutical marketing firm. Ms. Butkevich also previously held a number of positions with GE Capital, including Team Leader of its Merchant Banking Group. Prior to joining GE, Ms. Butkevich was the Vice President of Strategic Planning at North Fork Bancorp and a Manager at KPMG. Ms. Butkevich earned her Bachelor of Business Administration degree from the University of Miami and is licensed in New York as a Certified Public Accountant.

8. C.J. Rapp ("Rapp"), the President and Founder of Jolt, developed the concept of a high energy soft drink, and in 1985, launched the first product offering, Jolt Cola. Mr. Rapp instituted a unique approach to marketing its products by creating a network of independent beer distributors to sell Jolt Cola, thus immediately developing a national distribution network without the need of regional bottler relationships. Mr. Rapp also developed the use of resealable

cap cans for packaging the Jolt Cola product line and executed an exclusive Can Supply Agreement for such containers with Rexam Beverage Can Company ("Rexam"). Mr. Rapp earned his bachelor's degree from the State University of New York. In addition to his role as President of Debtor, Mr. Rapp serves on The Debtor's Board of Directors (the "Board").

9. Mr. Patric, who joined Jolt in 2003, currently serves as Jolt's Chief Operations Officer ("COO"); however, he has also previously served Jolt as its CFO. Prior to joining Jolt, Mr. Patric was a business advisor and developed a successful financial consulting business. In addition to his role as COO, Mr. Patric is a member of the Board.

10. In total, the Debtor's Board is made up of five members: (a) C.J. Rapp; (b) Lowell Patric; (c) Val Stalowir; (d) Kenneth Walters; and (e) John Sheppard. Kenneth Walters is the Senior Managing Director of Emigrant Capital Corporation ("ECC"), while Val Stalowir is an Executive Partner of ECC. As discussed below, ECC is one of the Debtor's prepetition senior secured creditors, the proposed lender of debtor-in-possession financing, and the proposed stalking horse bidder of the sale of substantially all of the Debtor's assets.

C.  **Events Leading To Commencement Of The Debtor's Chapter 11 Case**

11. In 2005, Rexam, the world's second largest aluminum beverage can supplier, in consultation with the Debtor, created the user-friendly, resealable cap can concept. The cap can was the first 23.5 oz. product in the market with a resealable closure, generating considerable attention. In the summer of 2008, the Company introduced a 16 oz. version of the resealable cap can, which was also the first of its kind in the market.

12. Anticipating high sales of the 23.5 ounce version of the Jolt Cola product due to the Debtor's entrance into new markets, Rapp predicted sales of approximately 48 million cans per year, and thus entered into an exclusive supply agreement with Rexam (the "2007 Can

Supply Agreement") for this anticipated production. According to the terms of the 2007 Can Supply Agreement, the Debtor was obligated to purchase 90 million 23.5 ounce resealable cans between January of 2007 and December of 2009 (the "Minimum Production"). The terms of the 2007 Can Supply Agreement further provides that the Debtor may be obligated to pay a capital reimbursement expense (the "Capital Reimbursement Expense") to Rexam in the event the Debtor does not reach the Minimum Production.

13. The Board did not approve the 2007 Can Supply Agreement in its final form, and in fact, never in fact saw a final copy of the 2007 Can Supply Agreement until a dispute concerning the agreement arose in 2009.

14. In 2007, and for most of 2008, the Debtor failed to meet its business plan. Commencing in the last quarter of 2008, as a result of the economic effects of the recession, the Debtor's sales started to slow. The Debtor sought additional liquidity by entering into an agreement with ECC for a new loan facility of $2.0 Million. This financing was in addition to, and subordinate to, an existing line of credit the Debtor already had with Emigrant Business Credit Corporation ("EBCC").

15. During 2009, the economic environment continued to weaken. The energy drink industry in particular, as its products are relatively more expensive than other beverage products, experienced even greater challenges.

16. Under the 2007 Can Supply Agreement the Debtor was committed to purchasing resealable cans that cost three times the amount of non-resealable cans that make up a majority of the packaging in the energy drink category. As a result of a downturn in growth in the energy drink industry from double digits to no growth between the second half of 2008 and the first part

of 2009, major multi-billion dollar competitors of the Debtor began to fight for market share and growth by significantly lowering their prices.

17. Typically, until the second quarter of 2009, energy drinks were sold to suppliers for a price of two for five-dollars. As a result of the changing market conditions, the prices quickly dropped to two for three-dollars.

18. In order to offset the impact of the economic environment on their operating performance, both Coca Cola ("Coke") and Pepsi Cola ("Pepsi"), competitors of the Debtor, significantly reduced their retail prices and increased their promotional efforts, which increased competition with the Debtor's product and further impacted the Debtor's sales. By June of 2009 the Debtor's revenues were 50% below projections and 52% lower than revenues realized in the comparable prior year period.

19. Additionally, Coke partnered with Monster, the second most popular energy brand, and Pepsi partnered with Rockstar, the third most popular energy brand, further accelerating the price war. The Debtor, which was unable to lower its pricing on the resealable cans, could no longer compete with the leading energy drinks on a value basis and still be profitable.

20. In order for the Debtor to be competitive in the market, the company needs to launch a non-resealable package; however, with the current Rexam claims and asserted liabilities, it is unlikely that the Debtor can secure additional capital and pursue this strategy.

21. As discussed above, under the terms of the 2007 Supply Agreement, the Debtor was required to purchase the Minimum Production of 90 million cans by December 31, 2009 or Rexam could assess a Capital Reimbursement Fee, calculated by Rexam to be approximately

$2.1 Million. To date, the Debtor has purchased only 27 million cans required by the Minimum Production.

22. The 2007 Can Supply Agreement also permits Rexam to sell unused production capacity and credit those sales to the Debtor's Minimum Production. It is unclear whether Rexam appropriately credited sales towards the Debtor's Minimum Production.

23. During the summer of 2009, a dispute arose with Rexam under the 2007 Can Supply Agreement. Specifically, Rexam and the Debtor dispute whether appropriate credit has been given to the Debtor for sales of unused production capacity. Additionally, Rexam claims to hold approximately 7 million cans, or the equivalent of $2 Million in inventory, produced at the Debtor's request.

24. In early 2008, the Debtor retained William Blair & Company ("William Blair"), a middle market investment bank, to explore a possible sale (the "Potential Sale") or fundraising for the company. Given the Debtor's worsening sales trends and unsuccessful launch of the 16 ounce resealable cans, William Blair advised that it would be unsuccessful in either selling the company or raising additional capital. William Blair alternatively advised the Debtor to seek additional capital through friends and family of the company.

25. In January 2009, ECC committed to a $2.0 Million tranche of debt financing; however, the company's performance continued to deteriorate and the planned turnaround and sales revenue as outlined by Mr. Rapp when he executed the 2007 Can Supply Agreement did not materialize. The Board again approached William Blair to evaluate the Debtor's funding options. William Blair again stated that the company's best source of funding would come from friends and family. Mr. Rapp sought additional funding; however he was unsuccessful in securing funding from any source.

26. As a result of these and other issues, Rexam and various other key vendors terminated trade credit, further threatening the Debtor's liquidity. Certain members of the Debtor's Board contacted friends and family members seeking capital investments into the company; however, no additional capital sources were located.

27. The Debtor is in default of its covenant under the EBCC working capital line, and has reached the availability limit on the line of credit with ECC making this filing necessary for the Company to obtain further financing. Further, ECC is unwilling to continue funding the Debtor while the dispute with Rexam remains unresolved. Despite efforts made by the Board, the Debtor's management and counsel, discussions with Rexam have reached an impasse.

### D. Review of Asserted Liens and Security Interests

28. The senior management of the Debtor, in consultation with legal counsel, has reviewed and analyzed public filings to determine, among other things, the validity and priority of asserted liens and security interest.

29. Upon such review and analysis, the Debtor has determined that, as of the Petition Date, the Debtor is indebted to EBCC in the principal amount of not less than $150,000, which obligations is secured by a duly perfected, first-priority security interest in substantially all of the Debtor's assets. As of the Petition Date, the Debtor is indebted to ECC in the principal amount of not less than $2,200,000, which obligation is secured by a duly perfected, security interest in substantially all of the Debtor's assets, subordinated only to the prior, first lien of EBCC. Rexam also appears to hold a junior secured interest for the outstanding amount of $510,000.

### E. The Proposed DIP Financing

30. The Debtor requires debtor in possession ("DIP") financing in order to maintain is operations and preserve its going concern value while it attempts to sell substantially all of its

assets (the "Assets") to fund distributions to its creditors according to the priorities provided by the Bankruptcy Code.

31. Prior to the Petition Date the Debtor unsuccessfully attempted to obtain additional capital contributions and/or financing. ECC was the only prepetition secured creditor willing to extend post-petition financing to the Debtor. The Debtor believes, based on its current financial situation, it will be unable to obtain unsecured financing or any financing on terms better than those terms as set forth in the Credit Agreement (defined below), a copy of which is attached hereto as Exhibit B and is further expressly incorporated herein.

32. Due to the Debtor's decreased sales, limited financing and the large commitment with Rexam, the Debtor decided to pursue the filing of a chapter 11 case in order to preserve its going concern value for a sale of the Assets for the benefit of all its creditors (the "Proposed Sale"). Without the proposed post-petition financing from ECC, the Debtor will be forced to immediately shut-down operations and liquidate, thereby significantly reducing the opportunity for a sale of the business as a going concern.

33. The Debtor believes that because the proposed DIP Financing (as defined below) has no fees, nothing remotely similar to the DIP Financing could be obtained from any other lender, especially in light of the Debtor's limited Assets.

34. ECC has agreed to provide the Debtor with a working capital facility (the "DIP Financing") in the maximum amount of $1,000,000. The terms of the DIP Financing are set forth in the DIP Financing Term Sheet attached hereto as Exhibit A, and the draft Debtor in Possession Credit and Security Agreement ("Credit Agreement") is attached hereto as Exhibit B. If approved, the DIP Financing will provide the Debtor with the cash required to fund operations in accordance with the proposed budget attached hereto as Exhibit C (the "Budget") through the

week of January 22, 2010, or, more specifically, through the anticipated closing of a sale of the Debtor's Assets.

35. In order to ensure that the Debtor complies with the terms of the Credit Agreement, a *Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a), 363, 365 and Federal Bankruptcy Rules 2002, 6004, 6006 and 9014, (I) Approving Asset Purchase Agreement and Authorizing the Sale of Assets of Debtor Outside the Ordinary Course of Business; (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Interests and Encumbrances; (III) Authorizing the Assumption and Sale and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* (the "Sale Motion") was filed contemporaneously herewith.

**RELIEF REQUESTED**

36. By this Motion, the Debtor seeks the entry of interim and final orders, pursuant to sections 105, 362 and 364 of the Bankruptcy Code and Bankruptcy Rule 4001, (i) Authorizing Secured Post-Petition Financing, (ii) Granting Senior Priming Liens And Superpriority Administrative Expense Status, (iii) Providing Adequate Protection, (iv) Granting Limited Relief From The Automatic Stay, (v) Scheduling A Final Hearing, and (vi) Granting Related Relief.

**BASIS FOR RELIEF REQUESTED**

A. **Necessary Showing Under Section 364 of the Bankruptcy Code**

37. Pursuant to section 364 of the Bankruptcy Code, a court may authorize a debtor to obtain credit or incur debt the repayment of which is entitled to superpriority administrative expense status or is secured by a lien on the debtor's property where a debtor is unable to obtain credit on an unsecured basis. Specifically, section 364(c) of the Bankruptcy Code provides as follows:

(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

38. Cash collateral over the summer's value of sales will be insufficient to maintain the minimum necessary operations of the Debtor to preserve the on-going business values. As a consequence, all of the Debtor's postpetition expenses must be paid from DIP financing and cash collateral. The Debtor was unable to obtain financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or solely in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code. Accordingly, the Debtor proposes to obtain postpetition financing from ECC in the amount of up to $1,000,000, on the terms and conditions as summarized below:[1]

(a) Pursuant to Bankruptcy Code Section 364(c)(1), the Debtor's obligations under the DIP Financing shall at all times constitute allowed Super-priority Claims;

(b) Pursuant to Bankruptcy Code Section 364(c)(2), the Debtor's obligations under the DIP Financing shall at all times be secured by a perfected first priority Lien on all Collateral that is otherwise not encumbered by a valid, perfected and non-avoidable Lien as of the Petition Date, including without limitation all Collateral that is not Pre-Petition Collateral ("Post-Petition Collateral"), but excluding accounts receivable generated after the Petition Date ("Post-Petition Accounts Receivable"); *provided, however*, that such Lien shall be subject in all respects to the Carve-Out (as defined in Section 2.13 of the DIP Agreement);

---

[1] All capitalized terms in subparagraphs (a)-(g) not otherwise defined in this Motion, shall have the meanings ascribed to them in the Credit Agreement.

(c)     Pursuant to Bankruptcy Code Section 364(c)(3), the Debtor's obligations under the DIP Financing shall at all times be secured by a second priority Lien on (i) all Pre-Petition Collateral, junior in right only to the Carve-Out and the Lien of EBCC on accounts receivable generated before the Petition Date ("Pre-Petition Accounts Receivable"), (ii) Post-Petition Accounts Receivable, junior in right only to the Carve-Out and the Lien of EBCC on Post-Petition Accounts Receivable that may be granted EBCC under the Interim Order and Final Order, and (iii) Chapter 5 Claims, junior in right only to the Carve-Out and the Lien of EBCC on Chapter 5 Claims that that may be granted EBCC under the Interim Order and Final Order;

(d)     Pursuant to Bankruptcy Code Section 364(d), the Debtor's obligations under the DIP Financing shall be secured by a perfected, priming superpriority Lien on all Pre-Petition Collateral, which Lien shall be senior in right to (i) otherwise valid and perfected Liens in existence on the Petition Date in favor of any Person other than Lender or EBCC and (ii) otherwise valid and perfected Liens in existence on the Petition Date in favor of EBCC on Pre-Petition Collateral other than Pre-Petition Accounts Receivable; *provided, however*, that the Liens granted to Lender hereby shall be subject and subordinate, in each case with respect to subclauses (a) through (d) above, to the Carve-Out;

(e)     The Debtor's obligations under the DIP Financing shall at all times be senior to the rights of the Debtor and any successor trustee(s) or estate representative(s) in any case or proceeding under the Bankruptcy Code; and

(f)     The Debtor's obligations under the DIP Financing shall not be subject to subordination to any other lien or security interest or claim under Section 510 of the Bankruptcy Code, or to surcharge under Section 506 of the Bankruptcy Code or otherwise.

39.     The liens proposed to be granted in favor of the Lender and EBCC on Chapter 5 Claims are proposed on an interim basis only. Any official committee of unsecured creditors ("Committee") appointed in this case, and any other creditors or parties in interest, will have an opportunity to object to the granting of such liens on a final basis prior to the Final Hearing.

40.     The Debtor was unable to obtain financing on terms more favorable than those proposed by the Lender. In fact, the Debtor believes that without the DIP Financing from the Lender, there would have been no other party willing to provide postpetition funding to the Debtor because of the Debtor's limited sales and assets. Currently, the Debtor's key suppliers

refuse to provide any vendor credit to the Debtor. Accordingly, the Debtor believes that the terms of the DIP Financing represent the best financial package currently available to the Debtor.

41. The Debtor submits that, given its prepetition efforts to identify potential lending sources, no further search is required at this time. *See Bray v. Shenandoah Fed. Say. & Loan Ass'n.* (*In re Snowshoe Co., Inc.*), 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't. Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (holding that the debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders). While there are a few lenders likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd, sub nom.*; *Anchor Say. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also*, *In re Ames*, 115 B.R. at 40.

42. The Debtor further submits that the terms of the DIP Financing are appropriate and reasonable and that deference should be given to the Debtor's reasonable business judgment. *See*, *Group of Institutional Investors v. Chicago Mil. St. P. & Prac. Ry.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding the rejection or assumption of a lease is left to the business judgment of the debtor); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) ("[B]usiness judgment should be left to the board room and not to this Court"); *see also In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on behalf of TWA ... [were] reasonable under the circumstances and in the best interest of TWA and its creditors."); *In re TM Carlton House Partners, LTD*, 91

B.R. 349, 358 (Bankr. E.D. Pa. 1988) (holding that due to the debtor's distinct awareness of its own financial needs, the court would not second-guess its business judgment to put aside cash to effectuate a refinancing of its debts.); *cf.*, *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("business judgments should be left to the board room and not to this Court").

### B. Need for Immediate Borrowings to Avoid Irreparable Harm

43. Bankruptcy Rule 4001 permits a court to approve a debtor's request for the use of postpetition financing on an interim basis "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001. This type of interim relief is necessary for them to avoid immediate and potentially irreparable damage to the Debtor's business. As discussed above, the DIP Financing provides the Debtor with 13 weeks of financing during which time the Debtor will actively market its Assets as a going concern to maximize the value received by its creditors and close such a sale. The Debtor believes that the Budget and the Carve-Out provide for the payment of all currently anticipated administrative expenses in its chapter 11 case for the stated time period. Without immediate DIP Financing, the Debtor will be forced to shut down its operations immediately and commence a liquidation, which will cause immediate and irreparable harm to its estate and creditors.

44. Pursuant to Bankruptcy Rule 4001(c)(2), the Debtor is required to give fifteen (15) days notice of the Final Hearing. As set forth in the Budget, the Debtor will need to draw down on the DIP Financing in order to fund its operations prior to the Final Hearing. Accordingly, the Debtor hereby seeks authority to borrow funds under the DIP Financing, pending the Final Hearing on the Motion, on an interim basis up to the amount set forth in the Budget (including the permitted variance) that will accrue before the Final Hearing.

45. The Debtor submits that sufficient notice of this interim relief was provided pursuant to sections 102(1), 362, and 364 of the Bankruptcy Code, and Bankruptcy Rules 2002 and 4001(c), and other applicable procedures. Specifically, the Debtor provided notice of the first-day hearing in these chapter 11 cases by facsimile or hand delivery on the following parties: (i) the Office of the United States Trustee for the Western District of New York, (ii) the creditors identified on the Debtor's list of twenty (20) largest unsecured creditors, (iii) counsel to Lender; (iv) counsel to EBCC; and (v) counsel to Rexam.

### C. The DIP Loan Agreement Was Negotiated in Good Faith

46. Section 364(e) of the Bankruptcy Code provides as follows:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

47. The DIP Financing and all other related documents were negotiated in good faith and at arm's-length between the Debtor, the Lender, and EBCC. Accordingly, the Debtor submits that any loans or extensions of credit to be made by the Lender should be deemed to have been made in good faith within the meaning of section 364(e) of the Bankruptcy Code. In addition, to the new loan, the DIP Financing makes cash collateral available to the Debtor.

### D. Adequate Protection and Relief from the Automatic Stay to Lender

48. As adequate protection for the new loans under the DIP Financing and the Debtor's use of cash collateral, the Debtor proposes to grant EBCC the liens, including first-priority liens in pre- and post-petition accounts receivable and Chapter 5 causes of action, and

other protections as set forth in the Credit Agreement. The granting of the senior lien on Chapter 5 causes of action is a condition to the new financing.

49. As adequate protection, the Debtor proposes to grant Lender and Rexam replacement liens, to the same extent and priority as they held prior to the Petition Date, on Post-Petition Collateral, as such term is defined in the Credit Agreement. Rexam's alleged lien appears, as a matter of record, to be junior and subordinate to the duly perfected senior prepetition liens of the Lender and EBCC. As such, the Debtor submits that the replacement lien proposed to Rexam is sufficient adequate protection of Rexam's apparent lien and satisfies the requirements of Bankruptcy Code section 364(d)(1)(B). The Debtor further submits that it will satisfy its burden of proof under section 364(d)(2) of the Bankruptcy Code at the final hearing on this Motion.

50. The Debtor further requests that Lender be granted relief from the automatic stay to exercise its rights and remedies upon any Event of Default under the Credit Agreement and the Deposit Account Control Agreement dated June 2, 2008 (the "Deposit Agreement")[2] without further order of the Court; *provided, however*, that Lender's exercise of any such remedy shall be upon three (3) days prior notice to EBCC, the United States Trustee, the Debtor and the Committee.

### E. Request for Final Hearing and the Proposed Notice Thereof

51. The Debtor requests that the Final Hearing on the Motion be scheduled in accordance with Bankruptcy Rule 4001(c)(2). The Debtor intends to serve notice of the Final Hearing via regular first-class U.S. Mail to all appropriate parties in accordance with the Bankruptcy Rules and Local Rules.

---

[2] As set forth in the Credit Agreement, the Debtor proposes to continue to perform under the Deposit Agreement. EBCC will act as an administrative agent for the Lender under the Credit Agreement. The Debtor seeks authority and approval of these arrangements.

52. The Debtor further requests that any opposition to the relief requested in the Motion be in writing, filed with the Court, and served upon (a) William I. Kohn, Esq., Benesch Friedlander Coplan & Aronoff LLP, 2300 BP Tower, 200 Public Square, Cleveland, OH 44114-2378, fax (216) 363-4588; (b) counsel for Lender, Attn: Ken Walters, 6 E. 43rd, New York, NY 10017; (c) EBCC, 6 East 43rd Street, 53rd Floor, New York, New York 10017, Attn: Sondra Roland; (d) counsel for Rexam, Joshua R. Markus, Esq., 8770 W. Bryn Mawr Avenue, Suite 11, Chicago, Illinois 60631, fax (773) 399-3411; (e) The Office of the United States Trustee, Western District of New York, Rochester Office, Attn: Kathleen Dunivin Schmitt, 100 State Street, Room 609, Rochester, New York 14614, fax (585) 263-5862; and (f) any other parties requesting notice in this case.

53. No previous application for the relief requested herein has been made to this or any other Court.

## **NOTICE**

54. No trustee, examiner, or creditors' committee has been appointed in this chapter 11 case. Notice of this Motion has been given to: (a) the United States Trustee for the Western District of New York, (b) the Debtor's twenty largest unsecured creditors; (c) Emigrant Business Credit Corporation; (d) Emigrant Capital Corporation; and (e) Rexam Beverage Can Company. In light of the nature of the relief requested herein, Debtor submits that no other or further notice is required.

WHEREFORE, the Debtor respectfully request that the Court enter the Interim and Final Orders (i) Authorizing Secured Post-Petition Financing, (ii) Granting Senior Liens and Superpriority Administrative Expense Status, (iii) Providing Adequate Protection, (iv) Granting Limited Relief From The Automatic Stay, (v) Scheduling A Final Hearing, and (vi) Granting Related Relief, and grant such other and further relief as is just and proper.

Dated: September 28, 2009

Respectfully submitted,

/s/ *William I. Kohn*
William I. Kohn (NY No. 4442273)
Stuart A. Laven, Jr. (NY No. 4446720)
BENESCH, FRIEDLANDER,
 COPLAN & ARONOFF LLP
200 Public Square, Suite 2300
Cleveland, OH  44114-2378
(216) 363-4500 (Telephone)
(216) 363-4588 (Facsimile)
wkohn@beneschlaw.com
slaven@beneschlaw.com

*Proposed Counsel for The Jolt Company, Inc.,
Debtor and Debtor in Possession*