UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

-------------------------------------------------------x
In re                               :        Chapter 11
                                    :
THE JOLT COMPANY, INC.,             :        Case No. 09-22531
                                    :
                Debtor.             :        Judge John C. Ninfo, II
-------------------------------------------------------x

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§105(A), 363 AND 365 AND FEDERAL BANKRUPTCY RULES 2002, 6004, 6006, AND 9014, (A) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF ASSETS OF DEBTOR OUTSIDE THE ORDINARY COURSE OF BUSINESS; (B) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (C) AUTHORIZING THE ASSUMPTION AND SALE AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (1)) GRANTING RELATED RELIEF**

The Jolt Company, Inc., the debtor and debtor in possession in the above case (the "Debtor" or "Seller"), by and through its undersigned counsel, hereby file this motion (the "Motion") for entry of an order: (A) approving that certain Asset Purchase Agreement (the "Agreement"), a copy of which is attached as <u>Exhibit A</u> attached hereto, entered into or to be entered into by and between the Debtor and PEMF Partners, LLC ("Purchaser"), or its assignee(s) or designee(s); (B) approving the sale (the "Sale") of substantially all of the Debtor's assets (the "Assets") outside the ordinary course of business and free and clear of all liens, claims, interests and encumbrances (collectively, the "Encumbrances"), and subject to higher or better bids; (C) authorizing and approving the assumption and assignment of certain executory contracts and unexpired leases described as "Purchased Contracts" in the Agreement[1] and (D) granting related relief. The facts and circumstances supporting this Motion are set forth in the

---

[1] Capitalized terms not defined herein shall have the meanings given to them in the Agreement and the Bid Procedures Motion (defined below).

concurrently filed *Affidavit of Robert Clamp in Support of First Day Motions* (the "Clamp Affidavit"). In further support of the Motion, the Debtor respectfully states as follows:

## JURISDICTION

1.        The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. § § 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## GENERAL BACKGROUND

2.        Contemporaneously with the filing of this Motion (the "Petition Date"), the Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtor is authorized to continue to operate its businesses and manage its properties as Debtor-in-possession pursuant to sections 1107(a) and 1108 of Title 11 of the Bankruptcy Code.

3.        No request for appointment of a chapter 11 trustee or examiner has been made and, as of the date hereof, no official committee has been appointed.

## HISTORY AND OPERATIONS

1.        The Debtor, which also conducts business as Wet Planet Beverages, was created in 1985 by C.J. Rapp.  When the Debtor was introduced over 20 years ago, it was the pioneer in the energized beverage category, which has served as the foundation for its rich brand equity. The media attention surrounding Jolt Cola's 1985 introduction catapulted the brand into national awareness, as Jolt Cola captured the imagination of taste-makers, musicians and the entertainment industry. Within weeks of launch, Jolt Cola appeared on the David Letterman

Show and was featured in USA Today, positioning Jolt Cola as an icon for energy-fueled lifestyles. The extensive media coverage made quite an impression with consumers and, soon, drinking one's first Jolt Cola became a rite of passage for young Americans. Among independent mid-sized energy brands, Jolt Cola is the longest lived, preeminent privately held brand in the $4.9 billion energy drink category.

2. Currently the Debtor's products are sold throughout the United States, Canada and Europe. The Debtor sells its product directly to four leading retailers that provide over 12,000 points of sale through their national chain stores. The Debtor also utilizes a network of distributors reaching approximately 25,000 retail locations in the United States and Canada.

3. The Debtor's officers include Robert Clamp, Katherine Butkevich, C.J. Rapp, and Lowell Patric.

4. Mr. Clamp joined Jolt as its Chief Executive Officer ("CEO") in February of 2009. Mr. Clamp is currently also employed by the Boylan Bottling Company ("Boylan") under a Cost Sharing Agreement between Jolt and Boylan (the "Sharing Agreement"). Mr. Clamp has 29 years experience in the food and beverage industry, having previously served as the CEO of the Really Cool Food Company and also as senior manager for Nestle Waters North America, the Coca Cola Company and Proctor & Gamble. Mr. Clamp earned his Bachelor of Arts Degree in economics from Denison University.

5. Ms. Butkevich joined Jolt in 2009, also pursuant to the Sharing Agreement, where she serves as The Debtor's Chief Financial Officer ("CFO"). Prior to joining Debtor, Ms. Butkevich was a Vice President at Emigrant Capital, and a Senior Vice President of Finance and Treasurer of Medsite, a venture backed pharmaceutical marketing firm. Ms. Butkevich also previously held a number of positions with GE Capital, including Team Leader of its Merchant

Case 2-09-22531-JCN    Doc 12    Filed 09/28/09    Entered 09/28/09 13:22:09    Desc Main
Document    Page 3 of 24

Banking Group.  Prior to joining GE, Ms. Butkevich was the Vice President of Strategic Planning at North Fork Bancorp and a Manager at KPMG.  Ms. Butkevich earned her Bachelor of Business Administration degree from the University of Miami and is licensed in New York as a Certified Public Accountant.

6.     C.J. Rapp ("Rapp"), the President and Founder of Jolt, developed the concept of a high energy soft drink, and in 1985, launched the first product offering, Jolt Cola.  Mr. Rapp instituted a unique approach to marketing its products by creating a network of independent beer distributors to sell Jolt Cola, thus immediately developing a national distribution network without the need of regional bottler relationships.  Mr. Rapp also developed the use of resealable cap cans for packaging the Jolt Cola product line and executed an exclusive Can Supply Agreement for such containers with Rexam Beverage Can Company ("Rexam").  Mr. Rapp earned his bachelor's degree from the State University of New York.  In addition to his role as President of Debtor, Mr. Rapp serves on The Debtor's Board of Directors (the "Board").

7.     Mr. Patric, who joined Jolt in 2003, currently serves as Jolt's Chief Operations Officer ("COO"); however, he has also previously served Jolt as its CFO.  Prior to joining Jolt, Mr. Patric was a business advisor and developed a successful financial consulting business.  In addition to his role as COO, Mr. Patric is a member of the Board.

4.     In total, the Debtor's Board is made up of five members: (a) C.J. Rapp; (b) Lowell Patric; (c) Val Stalowir; (d) Kenneth Walters; and (e) John Sheppard.  Kenneth Walters is the Senior Managing Director of Emigrant Capital Corporation ("ECC"), while Val Stalowir is an Executive Partner of ECC.  As discussed below, ECC is one of the Debtor's prepetition senior secured creditors, the proposed lender of debtor-in-possession financing, and the affiliate of

PEMF Partners, LLC ("Purchaser") proposed stalking horse bidder of the sale of substantially all of the Debtor's assets.

## EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES

5.      In 2007, Wet Planet created the user-friendly, resealable cap can concept via collaboration with Rexam, the world's second largest aluminum beverage can supplier. The cap can was the first 23.5 oz. product in the market with a resealable closure, generating considerable attention. In the summer of 2008, the Company introduced a 16 oz. version of the resealable cap can, which was also the first of its kind in the market.

6.      Anticipating high sales of the 23.5 ounce version of the Jolt Cola product due to the Debtor's entrance into new markets, Rapp predicted sales of approximately 48 million cans per year, and thus entered into an exclusive supply agreement with Rexam (the "2007 Can Supply Agreement") for this anticipated production. According to the terms of the 2007 Can Supply Agreement, The Debtor was obligated to purchase 90 million 23.5 ounce resealable cans between January of 2007 and December of 2009 (the "Minimum Production"). The terms of the 2007 Can Supply Agreement further provides that the Debtor may be obligated to pay a capital reimbursement expense (the "Capital Reimbursement Expense") to Rexam in the event the Debtor does not reach the Minimum Production.

7.      Commencing in the last quarter of 2008, as a result of the economic effects of the recession, the Debtor's sales started to slow. The Debtor sought additional liquidity by entering into an agreement with ECC for a new loan facility of $2.0 Million. This financing was in addition to, and subordinate to, an existing line of credit the Debtor already had with Emigrant Business Credit Corporation ("EBCC").

8.     During 2009, the economic environment continued to weaken. The energy drink category in particular, as its products are relatively more expensive than other beverage products, experienced even greater challenges. Offsetting the impact of the economic environment became even more competitive.  For example, both Coca Cola and Pepsi Cola, competitors of the Debtor, significantly reduced their retail prices and increased their promotional efforts, which further impacted the Debtor's sales.  By June of 2009 the Debtor's revenues were 50% below projections and 52% lower than revenues realized in the comparable prior year period.

9.     As discussed above, under the terms of the 2007 Supply Agreement, the Debtor had committed to purchasing the Minimum Production of 90 million cans by December 31, 2009 or Rexam could require a Capital Reimbursement Fee, calculated by Rexam to be approximately $2.1 Million.  To date, the Debtor has purchased only 10 million cans required by the Minimum Production.

10.     The 2007 Can Supply Agreement also permits Rexam to sell unused production capacity and credit those sales to the Debtor's Minimum Production.  It is unclear whether Rexam appropriately credited sales towards the Debtor's Minimum Production.

11.     During the summer of 2009, a dispute arose with Rexam under the 2007 Can Supply Agreement.  Specifically, Rexam and the Debtor dispute whether appropriate credit has been given to the Debtor for sales of unused production capacity.  Additionally, Rexam claims to hold approximately 7 million cans, or the equivalent of $2 Million in inventory, produced at the Debtor's request.

12.     As a result of these and other issues, Rexam and various other key vendors terminated trade credit, further threatening the Debtor's liquidity.   Certain members of the

Debtor's Board contacted friends and family members seeking capital investments into the company; however, no additional capital sources were located.

13.     The availability limit on the line of credit with EMCC is currently reaching its availability limit making this filing necessary for the Company to obtain further financing.

## REVIEW OF ASSERTED LIENS AND SECURITY INTERESTS

14.     The senior management of the Debtor, in consultation with legal counsel, has reviewed and analyzed public filings to determine, among other things, the validity and priority of asserted liens and security interest.

15.     Upon such review and analysis, the Debtor has determined that, as of the Petition Date, EBCC has a first security interest in all of the Debtor's assets in the approximate amount of $2.5 Million.  ECC has a subordinated senior security interest in all of The Debtor's assets in the amount of $500,000, and Rexam appears to hold a junior secured interest in all of the Debtor's assets for the outstanding amount of $510,000.  EBCC and ECC have assigned their respective rights, claims and liens against Debtor to Purchaser such that Purchaser is duly authorized to credit bid the aggregate senior secured claims of EBCC and ECC in payment of the Purchase Price (defined below).

## THE PROPOSED SALE

16.     In light of the economic conditions and funding issues discussed above, in the summer of 2009, the Debtor hired CPG Magellan Consulting LLC (the "Consultant") to begin investigating the Potential Sale.

17.     After a thorough review, the Consultant advised the Debtor that it was not saleable through a private sale.  Rather, the Consultant recommended that the Debtor should obtain additional funding from an existing secured lender.

18.     After discussions with its existing secured lenders, the Board and ECC reached initial agreements regarding the Potential Sale in order to preserve the going concern value of the company.  As a condition to the sale, ECC required finality. The only way to achieve ECC's conditions was through the negotiation of an asset purchase agreement with ECC, pursuant to which ECC would credit bit the outstanding obligations of the Emigrant Entities, followed by an orderly sale of substantially all of the Debtor's assets under section 363 of the Bankruptcy Code, subject to higher and better bids pursuant to a Bankruptcy Court approved auction process.  This, the Consultant and the Board agreed, would attract other purchasers to bid at the Potential Sale.

19.     In order to effectuate the Potential Sale, ECC and EBCC assigned their respective rights, claims and liens against Debtor to Purchaser, such that Purchaser is duly authorized to credit bid the aggregate senior secured claims of EBCC and ECC in payment of the Purchase Price (defined below).

20.     Therefore, the Debtor, with the help of its counsel, prepared certain bid procedures (the "Bid Procedures") designed to attract potential bidders.  As is further disclosed in the motion to approve the Bid Procedures, The Debtor will begin marketing its assets immediately following the Petition Date, including placing ads in a national circulation of the Wall Street Journal as well as mailing direct notice to all known potential strategic buyers.

21.     Accordingly, concurrently with the filing of this Motion, the Debtor filed the *Debtor's Motion for Entry of Order, Pursuant to 11 U.S.C. § 105(a), 363, 365, 503, and 507 and Federal Bankruptcy Rules 2002 and 6004, (I) Approving Bid Procedures for Sale of Substantially All of the Sellers 'Assets; (II) Scheduling a Hearing to Consider the Sale and Approving the Form and Manner of Notices; (III) Establishing Procedures for Assumption and*

*Assignment of Certain Contracts, Including Notice of Proposed Cure Amounts; and (D)*

*Granting Related Relief* (the "Bid Procedures Motion").

## RELIEF REQUESTED

22.     By this Motion, the Debtor request that the Court enter an order:

(I) approving the sale the Assets to the Purchaser or to any other Successful Bidder(s),

free and clear of all Encumbrances; (II) authorizing and approving the Agreement; (III)

authorizing and approving the assumption and assignment of the Purchased Contracts; and (IV)

granting such other and further relief as is just and proper.

23.     The material terms of the Agreement are as follows: [2]

(a)     <u>Purchased Assets to be Sold</u>.  Upon the terms and subject to the conditions
set forth in this Agreement, effective as of the Effective Time, Seller shall sell, convey,
assign, transfer and deliver to Purchaser, free and clear of all Encumbrances other than
the Permitted Encumbrances and Purchaser shall purchase and acquire from Seller,
Seller's right, title and interest in and to all of Seller's property and assets, real, personal
or mixed, tangible and intangible, of every kind and description (but excluding the
Excluded Assets):

(i)     all Equipment;

(ii)     all Inventory;

(iii)     all Accounts Receivable;

(iv)     all Purchased Contracts listed on <u>Schedule 1</u>;

(v)     all data and Records related to the operations of Seller, including
financial and accounting Records, creative materials, advertising
materials, promotional materials, studies, reports, correspondence
and other similar documents and Records and, subject to Legal
Requirements, copies of all personnel Records;

(vi)     intangible rights and property of Seller, including any intellectual
property rights and licenses, patents, trade marks, trade names and
brands, know-how, trade secrets, recipes, liquor licenses and

---

[2]  This summary of the Agreement is provided for the Court's convenience only. To the extent that the summary
differs in any way from the terms of the Agreement, the terms of the Agreement shall control. Capitalized terms
used but not defined in this summary shall have the meanings given in the Agreement.

Case 2-09-22531-JCN    Doc 12    Filed 09/28/09    Entered 09/28/09 13:22:09    Desc Main
Document     Page 9 of 24

permits, good-will, telephone and telecopy numbers, and e-mail addresses, and websites except for such intangible rights as may be specifically excluded from the APA;

(vii) all insurance benefits of Seller, including rights and proceeds, arising from or pertaining to the Purchased Assets or the Assumed Liabilities prior to the Effective Time, unless otherwise treated in accordance with this Agreement;

(viii) all of Seller's claims for refunds of deposits to vendors and utility providers; and

(ix) all claims of Seller against Third Parties relating to the Purchased Assets whether choate or inchoate, known or unknown, contingent or non-contingent; including, without limitation, any claims or causes of action arising under chapter 5 of the Bankruptcy Code ("Chapter 5 Claims") (together with (a)(i)-(a)(ix) the "Purchased Assets").

(b) <u>Purchase Price</u>. The purchase price for the Purchase Assets shall be $1,725,000 (the "*Purchase Price*"); *provided, however*, that Purchaser shall reserve the right to bid the entire aggregate amount of EBCC and ECC's debt and the DIP Debt.

(c) <u>No Assumption of Other Liabilities</u>. Purchaser shall not assume any other Liability of Seller arising prior to the Closing Date. Liabilities for Taxes shall be prorated as of the Closing Date.

(d) <u>Closing</u>. Upon the terms and subject to the conditions of the Agreement, the closing of the Sale contemplated by the Agreement (the "Closing") shall take place at the offices of Benesch Friedlander Coplan and Aronoff, LLP, in Cleveland, Ohio, or such other place as the Parties may agree, commencing at 10:00 a.m. local time on the Tuesday following the satisfaction or waiver of all conditions to the obligations of the Parties to consummate the transactions contemplated hereby (other than conditions with respect to actions the respective Parties will take at the Closing itself) or such other date as Purchaser and Seller may mutually determine (the "Closing Date"). The Parties shall use their commercially reasonable efforts to consummate the transactions contemplated hereby within fifteen (15) days after the Bankruptcy Court has entered the Sale Order approving such sale to Purchaser.

(e) <u>Conditions to Obligations</u>. The obligations of the Seller and Purchaser to consummate the transaction to be performed by them in connection with the Closing are subject to the satisfaction or waiver of various closing conditions contained in Articles 7 and 8 of the Agreement, which include but are not limited to the Bankruptcy Court entering the Bid Procedures Order and Sale Order.

Case 2-09-22531-JCN   Doc 12   Filed 09/28/09   Entered 09/28/09 13:22:09   Desc Main
Document   Page 10 of 24

(f)     <u>Termination of Agreement</u>. The Agreement may be terminated at any time prior to the Closing as follows:

       (i)     mutual written consent at any time prior to the Closing;

       (ii)     Purchaser giving written notice to Seller if: (A) the Bid Procedures Motion is not granted and an order thereon is not entered on or before October 20, 2009; (B) Anyone other than Purchaser is declared by Seller or determined by the Bankruptcy Court to be the highest and best bidder or is otherwise selected as the purchaser of the Purchased Assets; (C) Seller has breached any material representation, warranty, or covenant contained in the Agreement in any material respect, Purchaser has notified Seller of the Breach, and the Breach has continued without cure for a period of fifteen (15) days after the notice of Breach; (D) An order approving this Motion has not been entered by the Bankruptcy Court on or before November 25, 2009; (E) Closing shall not have occurred on or before that date which is 30 days following the entry of the order granting this Motion by reason of a failure of one of the conditions listed in Articles 7 or 8 of the Agreement (unless the failure results primarily from Purchaser itself Breaching any representation, warranty, or covenant contained in the Agreement); or (F) Seller withdraws or otherwise ceases to prosecute entry of an order granting this Motion;

       (iii)     Seller giving written notice to Purchaser if: (A) Purchaser has breached any material representation, warranty of the Agreement in any material respect, Seller has notified Purchaser of the Breach, and the Breach has continued without cure for a period of fifteen (15) days after the notice of Breach; or (B) the Closing shall not have occurred on or before that date which is thirty-five (30) days after the date of entry of the Sale Order, by reason of the failure of any condition precedent under Sections 7 or 8 of the Agreement (unless the failure results primarily from Seller Breaching any representation, warranty, or covenant contained in this Agreement).

## BASIS FOR RELIEF REQUESTED

A.    <u>The Agreement and Sale Should be Approved</u>

24.    The relief requested by this Motion is appropriate and within the Court's authority to approve transactions under section 363(b) of the Bankruptcy Code and within the Court's equitable powers under section 105(a) of the Bankruptcy Code.

Case 2-09-22531-JCN   Doc 12   Filed 09/28/09   Entered 09/28/09 13:22:09   Desc Main
Document    Page 11 of 24

25.     Section 363(b)(l) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(l). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the disposition of a debtor's assets prior to confirmation of a plan.   However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the Debtor.  *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986); *see also Myers v. Martin* (*In re Martin*), 91 F.3d 389, 395 (3d Cir. 1996); *Committee of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Bakalis*, 220 B.R. 525, 532 (Bankr. S.D.N.Y. 1998); *Dai-Ichi Kangyo Bank, Ltd v. Montgomery Ward Holding Corp.* (In *re Montgomery Ward Holding Corp.*), 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

26.     Although a debtor enjoys great judicial defense in this regard, it must demonstrate: (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business; (b) that adequate and reasonable notice has been provided to interested persons; (c) that the Debtor have obtained a fair and reasonable price; and (d) that the sale was proposed in good faith. *See Polvay v. B.O. Acquisitions, Inc.* (*In re Betty Owens Schools, Inc.*), 1997 WL 188127 (S.D.N.Y. April 17, 1997); *see also Abbotts Dairies*, 788 F.2d at 143; *Bakalis*, 220 B.R. at 532; *Titusville Country Club v. Pennbank* (*In re Titusville Country Club*), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989).

27.     Further, if a debtor proposes to sell assets to an "insider," as that term is defined by the Bankruptcy Code, the debtor must fully disclose the relationship between the parties. *See Polvay*, 1997 WL 188127 at *4, *citing In re Wilde Horse Enter., Inc.*, 136 B.R. 830, 842 (Bankr. C.D. Cal. 1991). A sale for a fair and reasonable price, proposed in good faith and for a sound business purpose will not fail merely due to an insider relationship between the buyer and the seller. *See In re General Bearing Corp.*, 136 B.R. 361, 366 (Bankr. S.D.N.Y. 1992) *citing In re Thomson McKinnon Securities, Inc.*, 120 B.R. 301 (Bankr. S.D.N.Y. 1990).

28.     In addition, the relief requested by this Motion is appropriate and within the Court's equitable powers under section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under title 11. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *See In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr.* (*In re Pincus*), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., Chinichian v. Campolongo* (*In re Chinichian*), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liq. Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Term. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

29.     A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel*, 722 F.2d at 1071; *see also Montgomery Ward*, 242 B.R. at 155.

30.     The Debtor submits that more than ample business justification exists to sell the Assets to the Purchaser or any other Successful Bidder, as the case may be, pursuant to the terms of the proposed Bidding Procedures Order. The Debtor and its professionals have carefully considered and analyzed the Purchaser's offer as set forth in the Agreement, and in light of the circumstances described herein, have concluded that a sale of the Debtor's Assets is in the best interests of the estates and will maximize the value of the Debtor's estates. Thus, a sound business purpose justifies the sale of the Assets.

31.     The Debtor has limited cash and believes that a prompt sale at the outset of this bankruptcy case is vital to preserving the "going concern" value of the Debtor's business and to maximize recovery to creditors and other parties in interest. Thus, the Sale presents the best opportunity to realize value for the Debtor's creditors. As described above, the Debtor (through its professionals) has already begun marketing the Assets to potential bidders, and there will be ample time and opportunity for potential qualified bidders to submit overbids. The Debtor, in the exercise of its business judgment, and in consultation with its professionals, believes that the proposed Sale to the Purchaser, or any other Successful Bidder, will constitute the highest and best offer for the Assets.

Case 2-09-22531-JCN    Doc 12    Filed 09/28/09    Entered 09/28/09 13:22:09    Desc Main
Document       Page 14 of 24

32.     The Debtor submits that this Purchaser's credit-bid offer constitutes significant consideration for the Assets, and the proposed Sale is further subject to an open market process through the solicitation of competing bids in a Court-supervised auction (the "Auction"). Pursuant to the Bidding Procedures Order, all potentially interested bidders will receive adequate and reasonable notice of the opportunity to submit a competing bid prior to the Auction, and the Bidding Procedures will facilitate an open and competitive bidding process in which all parties will participate in good faith.

33.     Moreover, the Agreement was the product of good faith, arm's-length negotiations between the Debtor, on the one hand, and the Purchaser, on the other, and was negotiated with the active involvement of the Debtor's officers and professionals. The Debtor believes and submits that the sale of the Debtor's assets to the Purchaser pursuant to the Agreement is not the product of collusion or bad faith. All the evidence demonstrates that the Agreement is the product of arm's length negotiations between the Debtor, the Purchaser, and their respective professional advisors.

34.     As fully disclosed above, the a director of the Purchaser does hold a seat on the Debtor's Board, and the Purchaser holds the voting rights to a majority of the shares in the Debtor; however, the Debtor has already begun the process of actively marketing the Assets for sale to other potential bidders.  Additionally, the Debtor seeks to hold an Auction, according to the Bid Procedures set forth in the Bid Procedures Order that will enable alternative purchasers to easily access information regarding the Debtor and the potential Sale. For these reasons, the Sale satisfies the good faith element of the "sound business purpose" test.

B.      The Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code

35.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a bona fide dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. *See* 11 U.S.C. § 363(f); *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89 (2nd Cir. 1988).

36.     Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f). *See, e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820325 at *3, 6 (Bankr. D. Del. Mar. 27, 2001) (explaining that "courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of § 363(f)"); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc.* (*In re White Motor Credit Corp.*), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (authorizing sale free and clear of tort claims even if such claims are not covered specifically by the provisions of §363(f)). As the *Trans World Airlines* court explained, "[t]he authority to sell free and clear is broad. It reflects a compelling policy to encourage bankruptcy sales subject only to claims of a specific and recognized nature in the subject property." *Trans World*, 2001 WL 1820325, at *3. Thus, even in the case of general unsecured claimants, including tort claimants, who arguably have no specific interest in a debtor's property (and, therefore, section 363 of the Bankruptcy Code would not be applicable to such claims), courts have held that the authority to

conduct sales free and clear of such claims is still within their equitable powers. *White Motor Credit.*, 75 B.R. at 948.

37.     A sale of the Assets other than one free and clear of Encumbrances would have a material adverse impact on the Debtor's bankruptcy estate and would yield substantially less value for the Debtor's estate with less certainty than the proposed Sale. Accordingly, this alternative would be of substantially less benefit to the Debtor's estate.  Moreover, the Purchaser will not consummate the Sale if the Sale and the assignment of the Purchased Contracts to the Purchaser is not free and clear of all Encumbrances. Therefore, the Sale should be approved free and clear of Encumbrances, as being in the best interests of the Debtor, their estates and creditors, and all other parties in interest.

C.     <u>The Assumption and Assignment of the Purchased Contracts Should be Approved</u>

38.     By this Motion, the Debtor also seeks an order pursuant to sections 365(a) and (f) of the Bankruptcy Code, authorizing the Debtor to assume and assign the Purchased Contracts. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g., In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. S*ee Group of Institutional Investors v. Chicago M St. P. & P.R.R. Co.*, 318 U.S. 523 (1943) (applying Bankruptcy Act section 77 subsection (b), the

Case 2-09-22531-JCN    Doc 12    Filed 09/28/09    Entered 09/28/09 13:22:09    Desc Main
Document      Page 17 of 24

predecessor to Bankruptcy Code section 365); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989).

39.     The business judgment test merely requires a showing that the decision to assume will benefit the estate.  *See e.g., In re Penn Traffic Co.*  524 F.3d 373, 383 (2d 2008); *Orion Pictures Corp. v. Showtime Networks, Inc.* (*In re Orion Pictures Corp.*), 4 F.3d 1095, 1098 (2d Cir. 1993); *Sundial Asphalt Co. v. V.P.C. Investors, Corp. (In re Sundial Asphalt Co.),* 147 B.R. 72, 81 (E.D.N.Y.1992).

40.     Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank NA.*, 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(l).

41.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract, *See L.R.S.C. Co. v. Rickel Home Cirs.* (*In re Rickel Home Ctrs., Inc.*), 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also Leonard v. Gen. Motors Corp.* (*In re Headquarters Dodge, Inc.*), 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

42.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract. . . only if the trustee assumes such contract.. . and adequate assurance of

future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *Accord In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from Debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

43. Here, the Purchased Contracts being assumed and assigned to the Purchaser, or any other Successful Bidder as the case may be, are an integral part of the Assets being purchased, and accordingly, the assumption, assignment and sale of the Purchased Contracts will enhance the value of the Debtor's estates and is therefore reasonable. The Debtor respectfully submits that the proposed assumption and assignment and sale of the Purchased Contracts pursuant to the terms of the assignment procedures are appropriate and reasonably tailored to provide the non-Debtor parties to the Purchased Contracts with adequate notice of the proposed assumption and assignment of their applicable contract, the proposed cure amounts and the proposed assignee. Additionally, the Debtor believe that they can and will demonstrate that all requirements for assumption and assignment of the Purchased Contracts will be satisfied at the hearing on this Motion. The Debtor will provide all non-debtor counterparties to the Purchased Contracts an opportunity to be heard. Moreover, the Debtor, as required by the Bidding

Procedures Order, will also evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid for the Assets. For the reasons stated throughout this Motion, the Debtor, in exercising its sound business judgment, believes that selling the Assets and assuming and assigning and selling the Purchased Contracts to the Purchaser or any other Successful Bidder, as the case may be, is in the best interests of its estate. Thus, the Debtor respectfully submits that by the conclusion of the Sale Hearing, assumption and assignment and sale of the Purchased Contracts should be approved under applicable bankruptcy law.

D.     Sale of the Assets and Assignment of the Purchased Contracts are Proposed in "Good Faith" Under Section 363(m) of the Bankruptcy Code

44.     The Debtor additionally requests that the Court find that the Purchaser or any other Successful Bidder, as the case may be, is entitled to the protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale. Section 363(m) of the Bankruptcy Code provides, in pertinent part: "The reversal or modification on appeal of an authorization under subsection (b). . . of this section of a sale.. . of property does not affect the validity of a sale. . . under such authorization to an entity that purchased. . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale.. . were stayed pending appeal." 11 U.S.C. § 363(m).

45.     Section 363(m) thus protects the Purchaser of assets sold pursuant to section 363 from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal. By its terms, section 363(m) applies to sales of interests in tangible assets. Section 363(m) also protects the assignee of a debtor's interest in executory contracts under section 365 of the Bankruptcy Code. *See Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 497-98 (3rd. Cir. 1998); *In re CSM Realty Corp.*, 2001 WL 987919 (S.D.N.Y. Aug. 29, 2001).

46.     Therefore Debtor respectfully submits that section 363(m) applies to protect the Purchaser or any other Successful Bidder with respect to both the Assets and the Purchased Contracts.

47.     Although the Bankruptcy Code does not define "good faith Purchaser," courts construing section 363(m) of the Bankruptcy Code, have stated that "the phrase encompasses one who purchases in 'good faith' and for 'value'." *Abbotts Dairies*, 788 F.2d at 147.

48.     To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the Purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." *Id.* (*citing In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198(7th Cir. 1978); *see also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." *In re Pisces Leasing Corp.*, B.R 671, 673 (E.D.N.Y. 1986) (*quoting Rock Indus. Machinery Corp.*, 572 F.2d at 1198 (7th Cir. 1978)).

49.     As required by Section 363(m) of the Bankruptcy Code, both the Debtor and the Purchaser have acted in good faith in negotiating the sale of the Assets and the assignment of the Purchased Contracts. There is no evidence of fraud or collusion in the terms of the Sale or the assignment of the Purchased Contracts. To the contrary, as discussed throughout this Motion, the Sale will be the culmination of a lengthy solicitation and negotiation process in which all parties will be represented by sophisticated counsel and financial advisors.  All negotiations have been and will continue to be conducted on an aims length, good faith basis.  All relationships between the Purchaser and the Debtor have been fully disclosed.  The Bidding Procedures are designed to

ensure that no party is able to exert undue influence over the process. Further, the Bidding Procedures are designed to prevent the Debtor, the Purchaser or any other Successful Bidder from engaging in any conduct that would cause or permit the Sales to be avoided, or costs or damages to be imposed under, section 363(n) of the Bankruptcy Code.

50.     All creditors and parties in interest will receive notice of the Sale and will be provided an opportunity to be heard. Additionally, all non-debtor parties to the Purchased Contracts will be provided with notice of the assumption and assignment and sale and an opportunity to be heard. The Debtor submits that such notice is adequate for entry of the Sale Order and satisfies the requisite notice provisions required under section 363(b) and 365 of the Bankruptcy Code. Under the circumstances, the Purchaser or any other Successful Bidder, as the case may be, should be afforded the benefits and protections that section 363(m) of the Bankruptcy Code provides to a good faith Purchaser.

E.     <u>Relief from the Ten Day Waiting Periods Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate</u>

51.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property. . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease. . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." The Debtor requests that the Sale Order be effective immediately by providing that the ten (10) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

52.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h)

and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten (10) day stay period, Collier on Bankruptcy suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier on Bankruptcy provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

53.     The Debtor hereby request that the Court waive the ten (10) day stay period under Bankruptcy Rules 6004(h) and 6006(d).

54.     All creditors and parties in interest will receive notice of the Sale or a competing transaction and will be provided with an opportunity to be heard. Additionally, all non-debtor parties to Purchased Contracts will receive notice of assumption and assignment and an opportunity to be heard. The Debtor submit that such notice is adequate for entry of the order approving this Motion and waiving the ten (10) day waiting periods under Bankruptcy Rules 6004(h) and 6006(d).

## **NOTICE**

55.     No trustee, examiner, or statutory committee has been appointed in this chapter 11 case.  The Debtor will serve notice of this Motion in accordance with the requirements set forth in the order approving the Bid Procedures. In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially in the form attached hereto as Exhibit B: (I) approving the sale the Assets to the

Case 2-09-22531-JCN    Doc 12   Filed 09/28/09   Entered 09/28/09 13:22:09    Desc Main
Document     Page 23 of 24

Purchaser or to any other Successful Bidder, as the case may be, free and clear of all Encumbrances; (II) authorizing and approving the Agreement; (III) authorizing and approving the assumption and assignment of the Purchased Contracts; and (IV) granting such other and further relief as is just and proper.

Dated:  September 28, 2009                  Respectfully submitted,

/s/ *William I. Kohn*
William I. Kohn (NY No. 4442273)
Stuart A. Laven, Jr. (NY No. 4446720)
BENESCH, FRIEDLANDER,
  COPLAN & ARONOFF LLP
200 Public Square, Suite 2300
Cleveland, OH  44114-2378
(216) 363-4500 (Telephone)
(216) 363-4588 (Facsimile)
wkohn@beneschlaw.com
slaven@beneschlaw.com

*Proposed Counsel for The Jolt Company, Inc.,*
*Debtor and Debtor in Possession*

DOC 3571059  Ver 2