# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "*Agreement*") is entered into effective as of September 28, 2009 (the "*Execution Date*"), by and among The Jolt Company, Inc., a New York corporation ("*Seller*"), and PEMF Partners LLC, a Delaware limited liability company ("*Purchaser*"). Seller and Purchaser may be referred to herein individually as a "*Party*" or collectively as the "*Parties*."

## RECITALS

WHEREAS, on September 28, 2009 (the "*Petition Date*") Seller commenced a case under Chapter 11 of the Bankruptcy Code (as hereinafter defined) (the "*Chapter 11 Case*") by filing a voluntary petition for relief in the United States Bankruptcy Court for the Western District of New York (the "*Bankruptcy Court*");

WHEREAS, prior to the Petition Date, Emigrant Capital Corp. ("*ECC*") and its affiliate Emigrant Business Credit Corp. ("*EBCC*") made term and revolving loans to Seller secured by liens and security interests in substantially all of Seller's assets (collectively, such loans being the "*Prepetition Facilities*");

WHEREAS, EBCC and ECC have assigned their respective rights, claims and liens against Seller to Purchaser, such that Purchaser is duly authorized to credit bid the aggregate senior secured claims of EBCC and ECC in payment of the Purchase Price (defined below) as set forth below;

WHEREAS, pursuant to the Prepetition Facilities, Seller's aggregate indebtedness to ECC and EBCC is not less than $2,400,000 (the "*Debt*") as of the Petition Date;

WHEREAS, since the Petition Date, ECC has provided debtor in possession financing to Seller on a senior secured basis pursuant to that certain Debtor in Possession Credit and Security Agreement dated as of September 28, 2009 (the "*DIP Facility*");

WHEREAS, the DIP Facility provides for loans and advances up to the aggregate principal amount of $1,000,000 (such amount being the "*DIP Debt*");

WHEREAS, Seller desires to sell, transfer, convey, assign and deliver to Purchaser, in accordance with Sections 363 and the other applicable provisions of the Bankruptcy Code, all of the Purchased Assets (as hereinafter defined), together with the Assumed Liabilities (as hereinafter defined), of Seller upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, Purchaser wishes to purchase and take delivery of such Purchased Assets and Assumed Liabilities upon such terms and subject to such conditions; and

WHEREAS, the Parties expect that the Purchased Assets will be sold pursuant to a Sale Order (as hereinafter defined) of the Bankruptcy Court approving such sale under Section 363 of the Bankruptcy Code and the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties agree as follows:

1. **DEFINITIONS AND USAGE OF CERTAIN TERMS**

   1.1 <u>Definitions</u>. For purposes of this Agreement, the following terms have the meanings specified or referred to in this Section 1.1:

   "*Accounts Receivable*" means (i) all trade accounts receivable and other rights to payment from customers of Seller and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped or products sold or services rendered to customers of Seller, (ii) credit card receivables, and (iii) all other accounts or notes receivable of Seller and the full benefit of all security for such accounts or notes.

   "*Bankruptcy Code*" means the United States Bankruptcy Code, 11 U.S.C. Section 101, <u>et seq.</u>, as amended, or any successor thereto, and any rules and regulations promulgated thereunder.

   "*Bankruptcy Court*" has the meaning set forth in the preface above.

   "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as amended, or any successor rules.

   "*Breach*" means any failure to comply with, or any inaccuracy in, any representation or warranty or any breach of, or failure to perform or comply with, any covenant or obligation, in or of this Agreement or any other Contract, or any event which with the passing of time or the giving of notice, or both, would constitute such a breach, inaccuracy or failure.

   "*Business*" means the business conducted by the Seller on the date hereof.

   "*Chapter 11 Case*" has the meaning set forth in the preface above.

   "*Closing Date*" means the date on which the Closing actually takes place.

   "*Code*" means the Internal Revenue Code of 1986, as amended.

   "*Contract*" means, with respect to any Person, any written agreement, contract, subcontract, lease, license, sublicense, understanding, arrangement, instrument, note, guaranty, indemnity, representation, warranty, deed, assignment, power of attorney, purchase order, work order, commitment, covenant, obligation, promise or undertaking of any nature to which such Person is a party or by which its properties or assets may be bound.

   "*Effective Time*" means 11:59 p.m. on the Closing Date.

   "*Encumbrance*" means any charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, mortgage, right of way, easement,

2

encroachment, servitude, right of first option, right of first refusal or similar restriction, including any restriction on use, voting (in the case of any security or equity interest), transfer, receipt of income, or exercise of any other attribute of ownership.

"*Execution Date*" has the meaning set forth in the preface above.

"*Final Order*" shall mean an order or judgment, the operation or effect of which is not stayed, and as to which order or judgment (or any revision, modification or amendment thereof), the time to appeal or seek review or rehearing has expired, whether or not an appeal has been taken.

"*Inventory*" means all inventories of the Seller, wherever located, including all raw materials, work in progress, packaging materials and other consumables used or consumed by Seller in the operation of Seller's Business.

"*Legal Requirement*" means any federal, state, local, municipal, foreign, international, multinational, or other constitution, law, ordinance, by-law, principle of common law, regulation, statute, or treaty.

"*Liability*" means, with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise and whether or not the same is required to be accrued on the financial statements of such Person.

"*Material Adverse Effect*" means

(a) with respect to Seller, any change, occurrence or development that has a material adverse effect on the business, results of operations or financial condition of Seller, or

(b) with respect to Seller, any inability of Seller to transfer the Purchased Assets to Purchaser, and, with respect to Purchaser, any inability of Purchaser to acquire the Purchased Assets, or

(c) any material increase or other material adverse change in the nature of the Assumed Liabilities, taken as a whole.

"*Order*" means any order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Authority or arbitrator.

"*Permitted Encumbrance*" means the encumbrances identified on **Schedule 2**.

"*Person*" means any individual, corporation, partnership, limited liability company, joint venture, trust or unincorporated organization or any government or any agency or political subdivision thereof.

3
Case 2-09-22531-JCN    Doc 12-1    Filed 09/28/09    Entered 09/28/09 13:22:09    Desc
Exhibit A    Page 3 of 19

***"Purchased Contracts"*** means the Seller Contracts (defined below), which are listed on **Schedule 1** to the Agreement, that Seller is assuming and assigning to Purchaser.

***"Record"*** means any information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

***"Sale Motion"*** means a motion or motions of Seller filed, noticed and served in accordance with the requirements of the Bankruptcy Code and Bankruptcy Rules seeking Bankruptcy Court approval pursuant to Bankruptcy Code Sections 363 and 365 of (1) a sale of the Purchased Assets to the Purchaser, and (2) to the extent required under the Bankruptcy Code or other applicable law, approval of assumption and assignment of certain of the Purchased Assets in accordance with the terms and conditions of this Agreement.

***"Sale Order"*** means an order of the Bankruptcy Court granting the Sale Motion.

***"Seller Contract"*** means any Contract: (a) to which Seller is a party; or (b) by which Seller or any of its assets is bound or subject to any obligation.

***"Tangible Personal Property"*** means all machinery, equipment, tools, furniture, office equipment, computer hardware, supplies, materials, vehicles and other items of tangible personal property (other than Inventories) of every kind owned or leased by a Person (wherever located and whether or not carried on such Person's books), together with any express or implied warranty by the manufacturers or sellers or lessors of any item or component part thereof, and all maintenance records and other documents relating thereto.

***"Third Party"*** means a Person that is not a Party.

2. **SALE AND TRANSFER OF PURCHASED ASSETS; CLOSING**

    2.1  <u>Purchased Assets to be Sold</u>. Upon the terms and subject to the conditions set forth in this Agreement, effective as of the Effective Time, Seller shall sell, convey, assign, transfer and deliver to Purchaser, free and clear of all Encumbrances other than the Permitted Encumbrances listed on **Schedule 2** and Purchaser shall purchase and acquire from Seller, Seller's right, title and interest in and to all of Seller's property and assets, real, personal or mixed, tangible and intangible, of every kind and description (but excluding the Excluded Assets):

    (a)  all Equipment;

    (b)  all Inventory;

    (c)  all Accounts Receivable;

    (d)  all Purchased Contracts listed on **Schedule 1**;

    (e)  all data and Records related to the operations of Seller, including financial and accounting Records, creative materials, advertising materials, promotional

materials, studies, reports, correspondence and other similar documents and Records and, subject to Legal Requirements, copies of all personnel Records;

(f) all of the intangible rights and property of Seller, including any intellectual property rights and licenses, patents, trade marks, trade names and brands, know-how, trade secrets, recipes, liquor licenses and permits, good-will, telephone and telecopy numbers, and e-mail addresses, and websites except for such intangible rights as may be listed in **Schedule 3** attached hereto;

(g) all insurance benefits of Seller, including rights and proceeds, arising from or pertaining to the Purchased Assets or the Assumed Liabilities prior to the Effective Time, unless otherwise treated in accordance with this Agreement;

(h) all of Seller's claims for refunds of deposits to vendors and utility providers; and

(i) all claims of Seller against Third Parties relating to the Purchased Assets whether choate or inchoate, known or unknown, contingent or non-contingent, including, without limitation, any claims or causes of action arising under chapter 5 of the Bankruptcy Code ("***Chapter 5 Claims***").

All of the foregoing property and assets are herein referred to collectively as the "***Purchased Assets***."

2.2 Excluded Assets. Notwithstanding anything to the contrary contained in Section 2.1 or elsewhere in this Agreement, the following assets of Seller (collectively, the "***Excluded Assets***") are not part of the sale and purchase contemplated hereunder, are excluded from the Purchased Assets, and shall remain the property of Seller after the Closing:

(a) all Seller Contracts other than the Purchased Contracts (the "***Excluded Seller Contracts***");

(b) all rights of Seller under this Agreement;

(c) claims against Third Parties to the extent related solely to any Excluded Asset or Excluded Liabilities; and

(d) all personnel Records and other Records that Seller is required by law to retain in its possession.

2.3 Purchase Price. The purchase price for the Purchase Assets shall be $1,725,000 (the "***Purchase Price***"); *provided, however*, that Purchaser shall reserve the right to bid the entire amount of the Debt plus the DIP Debt.

2.4 Manner of Payment of Purchase Price. On the Closing Date, Purchaser shall pay the Purchase Price by credit bidding the Debt, and the DIP Debt if necessary, and offsetting the amount of the Debt, and DIP Debt if necessary, against Purchaser's obligation to pay the Purchase Price.

2.5     No Assumption of Other Liabilities.  Other than as specifically set forth above, Purchaser shall not assume any other Liability of Seller arising prior to the Closing Date. Liabilities for Taxes shall be prorated as of the Closing Date in accordance with Article 10 hereof.

2.6     Tax Allocation of Purchase Price.  Purchaser and Seller agree that the Purchase Price shall be allocated among the Purchased Assets in accordance with an allocation to be prepared by Purchaser and agreed upon by Seller, which agreement shall not be unreasonably withheld.  Such allocation shall be in accordance with Section 1060 of the Code and the applicable Treasury Regulations promulgated thereunder.  Purchaser and Seller shall report and file all of their respective Tax returns (including amended Tax returns and claims for refund) consistent with such allocation, and shall take no position contrary thereto or inconsistent therewith (including, without limitation, in any audits or examinations by any taxing authority or in any other proceedings).  Purchaser and Seller shall cooperate in the filing of any forms (including Forms 8594) with respect to such allocation.  Notwithstanding any other provisions of this Agreement, the foregoing agreement shall survive the Closing Date without limitation, and shall not be an admission of and shall not be evidence of the value of any of the Purchased Assets in the Seller's Chapter 11 Case or any other related proceeding, and shall be for Tax purposes only.

2.7     Closing.  The consummation of the transactions contemplated by this Agreement (the "*Closing*") shall take place at the offices of Benesch Friedlander Coplan and Aronoff, LLP, in Cleveland, Ohio, or such other place as the Parties may agree, commencing at 10:00 a.m. local time on the Tuesday following the satisfaction or waiver of all conditions to the obligations of the Parties to consummate the transactions contemplated hereby (other than conditions with respect to actions the respective Parties will take at the Closing itself) or such other date as Purchaser and Seller may mutually determine (the "*Closing Date*").  The Parties shall use their commercially reasonable efforts to consummate the transactions contemplated hereby within fifteen (15) days after the Bankruptcy Court has entered the Sale Order approving such sale to Purchaser.

2.8     Purchased Assets Sold "As Is, Where Is".  THE PARTIES HERETO AGREE THAT THE PURCHASED ASSETS PERTAINING TO THE PURCHASED LOCATIONS SOLD PURSUANT TO THIS AGREEMENT ARE SOLD, CONVEYED, TRANSFERRED AND ASSIGNED ON AN "**AS IS, WHERE IS**" BASIS "**WITH ALL FAULTS**" AND THAT, EXCEPT AS EXPRESSLY SET FORTH IN SECTION 3.5 OF THIS AGREEMENT REGARDING TITLE, SELLER MAKES NO REPRESENTATIONS, OR WARRANTIES, TERMS, CONDITIONS, UNDERTAKINGS OR COLLATERAL AGREEMENTS OF ANY NATURE OR KIND, EXPRESS OR IMPLIED, BY STATUTE OR OTHERWISE, CONCERNING THE PURCHASED ASSETS OR THE CONDITION, DESCRIPTION, QUALITY, USEFULNESS, QUANTITY OR ANY OTHER THING AFFECTING OR PERTAINING TO THE PURCHASED ASSETS ASSOCIATED WITH THE PURCHASED LOCATIONS OR THE OPERATION OR USE BY PURCHASER OF ANY OF THE PURCHASED ASSETS, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHICH WARRANTIES ARE ALSO HEREBY EXPRESSLY DISCLAIMED. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT SELLER SHALL NOT BE LIABLE

UNDER THIS AGREEMENT FOR ANY LOST PROFITS OR INDIRECT, CONSEQUENTIAL OR SPECIAL DAMAGES UNDER ANY CIRCUMSTANCES.

Purchaser confirms, acknowledges and agrees that it has inspected the Purchased Assets prior to the execution of this Agreement to the extent that it wishes to do so and that Purchaser is relying entirely upon its own investigations and inspections of the Purchased Assets in proceeding with the transaction contemplated hereunder. Purchaser acknowledges and agrees that any description of the Purchased Assets is for the purpose of identification only and no representation, warranty or condition is or will be given by Seller in respect of the accuracy of any description.

3. **REPRESENTATIONS AND WARRANTIES OF SELLER**

Seller hereby represents and warrants to Purchaser as follows:

3.1 <u>Organization and Good Standing</u>. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of New York and has all requisite corporate power and authority to conduct its business in the manner in which its business is currently being conducted.

3.2 <u>No Violation of Charter Documents and Contracts</u>. Neither the execution and delivery of this Agreement, nor the consummation of the transactions provided for herein or therein will conflict with, or (with or without notice or lapse of time, or both) result in a termination, Breach, impairment or violation of any provision of Seller's by-laws or other charter documents, as currently in effect, or any material Purchased Contract.

3.3 <u>Seller as Debtor in Possession; No Trustee</u>. From the Petition Date through the Closing Date, Seller is and has been at all times in its Chapter 11 Case a debtor in possession pursuant to Section 1107 of the Bankruptcy Code, and no trustee or examiner has been appointed in Seller's Chapter 11 Case.

3.4 <u>Taxes</u>. To Seller's knowledge and without investigation, no Governmental Authority has filed or recorded any lien in, on or upon any of the Purchased Assets as the result of non-payment or underpayment of any Taxes, and there has been no litigation, proceeding, or administrative action brought or threatened in writing against Seller alleging any liability of Seller for unpaid or underpaid Taxes.

For the purposes of this Agreement, "*Tax*" or "*Taxes*" refers to (i) any and all federal, state, local and foreign Taxes, assessments and other governmental charges, duties, impositions and Liabilities pertaining to Taxes, including Taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, excise and property Taxes, together with all interest, penalties and additions imposed with respect to such amounts, (ii) any Liability for payment of any amounts of the type described in clause (i) as a result of being a member of an affiliated, consolidated, combined or unitary group, and (iii) any Liability for amounts of the type described in clauses (i) and (ii) as a result of any express or implied obligation to indemnify another Person or as a result of any obligations under any agreements or arrangements with any

7

other person with respect to such amounts and including any Liability for Taxes of a predecessor entity.

    3.5    Title to Properties. Seller has good and marketable title to all of its Purchased Assets, or with respect to leased Purchased Assets other than real property, valid leasehold interests in, or with respect to licensed Purchased Assets, valid licenses. At the Closing and subject to Bankruptcy Court approval, Seller shall transfer the Purchased Assets to Purchaser free and clear of all Encumbrances (other than Permitted Encumbrances).

    3.6    Employees. Seller is in compliance in all material respects with all applicable Legal Requirements and Contracts pertaining to employment, employment practices, wages, hours, and terms and conditions of employment, including, but not limited to, employee compensation matters.

    3.7    [reserved].

4.    **REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser hereby represents and warrants jointly and severally to Seller as follows:

    4.1    Organization and Good Standing. Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of New York and has all requisite corporate power and authority to conduct its business in the manner in which its business is currently being conducted.

    4.2    Power, Authorization and Non-Contravention. Purchaser has the corporate power, legal capacity and authority to enter into and perform its obligations under this Agreement and any Purchased Contracts assumed pursuant to this Agreement.

    4.3    No Violation of Charter Documents, Contracts or Laws. Neither the execution and delivery of this Agreement, nor the consummation of the transactions provided for herein or therein, will conflict with, or (with or without notice or lapse of time, or both) result in a termination, Breach, impairment or violation of: (a) any provision of Purchaser's operating agreement or other charter documents, as currently in effect; (b) any material Contract to which Purchaser is a party or bound; or (c) any federal, state, local or foreign judgment, writ, decree, Order, statute, rule or regulation applicable to Purchaser.

    4.4    [reserved].

5.    **COVENANTS**

    5.1    Seller Covenants.

        (a)    Advice of Changes. During the period from the Execution Date until the earlier to occur of (a) the Effective Time or (b) the termination of this Agreement in accordance with the provisions of Article 9 hereof, Seller will promptly advise Purchaser in writing of: (i) the discovery by Seller of any event, condition, fact or circumstance occurring on or prior to the Execution Date that would render any

representation or warranty by Seller contained in this Agreement untrue or inaccurate in any material respect; (ii) any event, condition, fact or circumstance occurring subsequent to the Execution Date that would render any representation or warranty by Seller contained in this Agreement, if made on or as of the date of such event or the Closing Date (provided that representations and warranties which are confined to a specific date shall speak as of that date), untrue or inaccurate in any material respect; (iii) any Breach of any covenant or obligation of Seller pursuant to this Agreement; (iv) any event, condition, fact or circumstance that may make the timely satisfaction of any of the conditions set forth in Article 7 impossible or unlikely; and (v) any Material Adverse Effect on Seller.

      (b)    Access to Information.

           (i)    During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time or (b) the termination of this Agreement in accordance with the provisions of Article 9 hereof, subject to the terms and conditions hereof pertaining to the confidentiality and use of confidential and proprietary information, and subject to compliance with applicable Legal Requirements, Seller will provide Purchaser and its agents with reasonable access, during regular business hours, to the files, books, records and offices of Seller, including, without limitation, any and all information pertaining to Seller Taxes, commitments, Contracts, leases, licenses, real, personal and intangible property, and financial condition. Seller will cause its accountants to cooperate with Purchaser and Purchaser's agents in making available all financial information reasonably requested, including, without limitation, the right to examine all statements prepared, compiled or audited by such accountants.

           (ii)    Following Closing, Seller and its representatives shall have reasonable access to the books and records of Seller sold to Purchaser hereunder, during regular business hours and upon reasonable prior notice to Purchaser. If Purchaser determines that it no longer requires any such records, it shall give Seller and its counsel written notice in accordance with Section 11.11 hereof and Seller shall have thirty (30) days from its receipt of such notice to remove such records (or part thereof) that Purchaser no longer requires. Any such records not so removed by Seller may be destroyed by Purchaser after such thirty (30) day period.

5.2    Purchaser Covenants.

9

(a) Advice of Changes. During the period from the Execution Date until the earlier to occur of (a) the Effective Time and (b) the termination of this Agreement in accordance with the provisions of Article 9 hereof, Purchaser will promptly advise Seller in writing of any event, condition, fact or circumstance that may make the timely satisfaction of any of the conditions set forth in Article 8 impossible or unlikely.

(b) Satisfaction of Conditions Precedent. Upon the terms and subject to the conditions of this Agreement, Purchaser will use commercially reasonable efforts to satisfy or cause to be satisfied all the conditions precedent which are set forth in Article 8 on or before the Closing Date.

5.3 Further Assurances. Seller agrees that if, at any time before or after the Effective Time, Purchaser considers or is advised that any further agreements, assignments or other documents are reasonably necessary or desirable to vest, perfect or otherwise consummate the transactions contemplated in this Agreement, Seller shall – at Purchaser's cost and expense – execute and deliver all such proper agreements, assignments or other documents and do all other things reasonably necessary to vest, perfect or otherwise consummate the transactions contemplated in this Agreement.

6. **BANKRUPTCY PROCEDURES, ETC.**

6.1 Bid Procedures. No later than that date which is three (3) Business Days after the Execution Date, Seller shall file with the Bankruptcy Court a Motion (the "*Bid Procedures Motion*") requesting entry of an Order (the "*Bid Procedures Order*") granting all of the following relief:

(a) scheduling of an auction for the sale of the Purchased Assets (the "*Auction*") no later than November 20, 2009;

(b) scheduling of a hearing to authorize the sale of the Purchased Assets to Purchaser and the consummation of this Agreement no later than that date which is five (5) Business Days after the Auction Date; and

(c) establishing and affixing Twenty Five Thousand Dollars ($25,000) (the "*Minimum Bid Increment*") as the minimum increment for successive bids submitted at the Auction.

6.2 Sale Motion and Notice. No later than that date which is three (3) Business Days after the Execution Date, Seller shall file the Sale Motion (which may be combined with the Bid Procedures Motion) and give sufficient notice in accordance with the requirements of the Bankruptcy Code, the Bankruptcy Rules and the terms and conditions of this Agreement. Among other things, the Sale Motion shall seek entry of a Sale Order that finds and determines that Purchaser (i) is a good faith, arms'-length purchaser of the Purchased Assets, (ii) is entitled to credit bid the Debt in payment of the Purchase Price pursuant to Bankruptcy Code section 363(k), (iii) is entitled to the protections of Bankruptcy Code section 363(m), and (ii) is not a successor in interest to Seller.

6.3 [Reserved].

6.4 **Defense of Orders.** Seller shall use its best efforts to defend the Bid Procedures Order and the Sale Order in the event that Purchaser elects, in its sole discretion, to close the purchase of the Purchased Assets notwithstanding the pendency of any motion for reconsideration or appeal of such Orders.

7. **CONDITIONS TO OBLIGATIONS OF SELLER**

Seller's obligations hereunder are subject to the fulfillment or satisfaction, on and as of the Closing, of each of the following conditions (any one or more of which may be waived by Seller):

7.1 **Absence of Material Adverse Effect.** No uncured Material Adverse Effect with respect to Purchaser shall have occurred since the Execution Date.

7.2 **Sale Order.** The Bankruptcy Court shall have entered the Sale Order.

8. **CONDITIONS TO OBLIGATIONS OF PURCHASER**

The obligations of Purchaser hereunder are subject to the fulfillment or satisfaction on, and as of the Closing, of each of the following conditions (any one or more of which may be waived by Purchaser):

8.1 **Absence of Material Adverse Effect.** No Material Adverse Effect with respect to Seller shall have occurred since the Execution Date and be continuing.

8.2 **Bankruptcy Procedures.** Seller shall have fulfilled its obligations under Sections 6.1 and 6.2 of this Agreement.

8.3 **Sale Order.** The Bankruptcy Court shall have entered the Sale Order.

9. **TERMINATION**

9.1 **Termination of Agreement.** The Parties may terminate this Agreement as provided below:

(a) Purchaser and Seller may terminate this Agreement by mutual written consent at any time prior to the Closing.

(b) Purchaser may terminate this Agreement by giving written notice to Seller at any time prior to the Closing if:

    (i) the Bid Procedures Order shall not have been entered by the Bankruptcy Court on or before October 20, 2009;

    (ii) anyone other than Purchaser is declared by Seller or determined by the Bankruptcy Court to be the winning bidder at the Auction or is otherwise selected by Seller as the purchaser of some or all of the Purchased Assets,

        regardless of whether such other bidder consummates any subsequent purchase transaction;

(iii)  Seller has Breached any material representation, warranty, or covenant contained in this Agreement in any material respect, Purchaser has notified Seller of the Breach, and the Breach has continued without cure for a period of fifteen (15) days after the notice of Breach;

(iv)  the Sale Order shall not have been entered by the Bankruptcy Court on or before November 25, 2009;

(v)  the Closing shall not have occurred on or before that date which is thirty (30) days after the date of entry of the Sale Order, by reason of the failure of any condition precedent under Article 8 hereof (unless the failure results primarily from Purchaser itself Breaching any representation, warranty, or covenant contained in this Agreement); or

(vi)  Seller withdraws or ceases to prosecute entry of the Sale Order, the Bid Procedures Order, or otherwise withdraws its support for the transactions contemplated by this Agreement.

  (c)  Seller may terminate this Agreement by giving written notice to Purchaser at any time prior to the Closing if:

(i)  Purchaser has Breached any material representation, warranty of this Agreement in any material respect, Seller has notified Purchaser of the Breach, and the Breach has continued without cure for a period of fifteen (15) days after the notice of Breach; or

(ii)  the Closing shall not have occurred on or before that date which is thirty (30) days after the date of entry of the Sale Order, by reason of the failure of any condition precedent under Section 7 hereof (unless the failure results primarily from Seller Breaching any representation, warranty, or covenant contained in this Agreement).

10. **TAXES.**

  10.1  <u>Taxes Related To Purchased Assets and Assumed Liabilities</u>. All sales, use, gross-receipts, transfer, gains, excise, value-added or other similar Taxes in connection with the transfer of the Purchased Assets, and all recording and filing fees that may be imposed by reason of the sale, transfer, assignment of the Purchased Assets pertaining to the Purchased Locations and that are not exempt under Section 1146(c) of the Bankruptcy Code shall be paid by Purchaser on or prior to the Taxes' due date. Purchaser shall be liable for and pay all Taxes

applicable to the Purchased Assets that are attributable to Taxable years or periods beginning on the Closing Date and with respect to any Straddle Period, the portion of such Straddle Period beginning on the Closing Date. For purposes of this Agreement, *"Straddle Period"* shall mean any Taxable period beginning on, or before the Closing Date and ending thereafter.

10.2 Tax Refunds. Any Tax refunds (including any interest related thereto) received by Purchaser pertaining to Taxes that Seller has paid shall be for the account of Purchaser, and Seller shall pay over to Purchaser any such amount within ten (10) Business Days of receipt thereof.

10.3 Cooperation on Tax Matters. Seller and Purchaser shall cooperate fully with each other and make available or cause to be made available to each other for consultation, inspection and copying (at such other Party's expense) in a timely fashion such personnel, Tax data, relevant Tax returns or portions thereof and filings, files, books, records, documents, financial, technical and operating data, computer records and other information as may be reasonably required (i) for the preparation by such other Party of any Tax returns or (ii) in connection with any Tax audit or proceeding including one Party to the extent such Tax audit or proceeding relates to or arises from the transactions contemplated by this Agreement.

11. **MISCELLANEOUS**

11.1 Entire Agreement. This Agreement constitutes the entire understanding and agreement of the Parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties with respect to the subject matter hereof.

11.2 Assignment; Binding Upon Successors and Assigns. Neither Party hereto may assign any of its rights or obligations hereunder without the prior written consent of the other Party hereto. This Agreement will be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

11.3 No Third Party Beneficiaries. No provisions of this Agreement are intended, nor will be interpreted, to provide or create any third party beneficiary rights or any other rights of any kind in any client, customer, affiliate, stockholder, partner, employee of any Party hereto or any other Person unless specifically provided otherwise herein, and, except as so provided, all provisions hereof will be personal solely between the Parties to this Agreement.

11.4 No Successor Liability. The Parties acknowledge and agree that the transactions contemplated by this Agreement shall not cause Purchaser to be a successor in interest to Seller or the Business. Seller acknowledges that such a determination and understanding of non-successorship is a material inducement to Purchaser's execution and performance of this Agreement.

11.5 No Joint Venture. Nothing contained in this Agreement will be deemed or construed as creating a joint venture or partnership between the Parties hereto. No Party is by virtue of this Agreement authorized as an agent, employee or legal representative of any other Party. No Party will have the power to control the activities and operations of any other, and the Parties' status is, and at all times, will continue to be, that of independent contractors with

13
Case 2-09-22531-JCN    Doc 12-1    Filed 09/28/09    Entered 09/28/09 13:22:09    Desc
Exhibit A    Page 13 of 19

respect to each other. No Party will have any power or authority to bind or commit any other. No Party will hold itself out as having any authority or relationship in contravention of this Section.

11.6 <u>Severability</u>. If any provision of this Agreement, or the application thereof, is for any reason held to any extent to be invalid or unenforceable, the remainder of this Agreement and application of such provision to other persons or circumstances will be interpreted so as reasonably to affect the intent of the Parties hereto. The Parties further agree to replace such unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of the void or unenforceable provision.

11.7 <u>Section Headings</u>. A reference to an Article, Section or Schedule will mean an Article or Section in, or a Schedule to, this Agreement, unless otherwise explicitly set forth. The titles and headings in this Agreement are for reference purposes only and will not in any manner limit the construction of this Agreement. For the purposes of such construction, this Agreement will be considered as a whole.

11.8 <u>Amendment, Extension and Waivers</u>. At any time prior to the Effective Time, Purchaser and Seller may, to the extent legally allowed: (a) extend the time for performance of any of the obligations of the other Party; (b) waive any inaccuracies in the representations and warranties made to such Party contained herein or in any document delivered pursuant thereto; and (c) waive compliance with any of the agreements, covenants or conditions for the benefit of such Party contained herein. Any term or provision of this Agreement may be amended. The waiver by a Party of any Breach hereof or default in the performance hereof will not be deemed to constitute a waiver of any other default or any succeeding Breach or default. The failure of any Party to enforce any of the provisions hereof will not be construed to be a waiver of the right of such Party thereafter to enforce such provisions. The Agreement may be amended by the Parties hereto at any time.

11.9 <u>Governing Law</u>. The validity of this Agreement the construction of its terms, and the interpretation and enforcement of the rights and duties of the parties of this Agreement will be exclusively governed by and construed in accordance with the internal laws of the State of New York as applied to agreements entered into solely between residents of and to be performed entirely in the State of New York, without reference to that body of law pertaining to conflicts of law or choice of law.

11.10 <u>Jurisdiction; Venue</u>. Each of the Parties to this Agreement hereby agrees that the Bankruptcy Court shall have exclusive jurisdiction to hear and determine any claims or disputes between the Parties hereto pertaining directly or indirectly to this Agreement, and all documents, instruments and agreements executed pursuant hereto or thereto, or to any matter arising herefrom (unless otherwise expressly provided for herein or therein). To the extent permitted by law, each Party hereby expressly submits and consents in advance to such jurisdiction in any action or proceeding commenced by the other Party hereto in any of such courts, and agrees that service of such summons and complaint or other process or papers may be made by registered or certified mail addressed to such Party at the address to which notices are to be sent pursuant to this Agreement. Each of the Parties waives any claim that the Bankruptcy

Court is an inconvenient forum or an improper forum based on lack of venue. The choice of forum set forth in this Section shall not be deemed to preclude the enforcement of any judgment obtained in such forum or the taking of any action to enforce the same in any other appropriate jurisdiction.

11.11 <u>Notices</u>. Any notice or other communication required or permitted to be given under this Agreement will be in writing, will be delivered personally or by mail or express delivery, postage prepaid, and will be deemed given upon actual delivery or, if mailed by registered or certified mail, on the third Business Day following deposit in the mails, addressed as follows:

> If to Purchaser:  Emigrant Capital Corp.
> Attn: Ed. Burns & Ken Walters
> 6 East 43rd Street
> New York, New York 10017
>
> If to Seller:  The Jolt Company, Inc.
> Attn: Robert Clamp
> 130 Linden Oaks, Suite C
> Rochester, New York 14625
>
> with a copy to:  Benesch, Friedlander, Coplan & Aronoff LLP
> 2300 BP Tower
> 200 Public Square
> Cleveland, OH  44114-2378
> Attention: William I. Kohn, Esq.
> Phone: (216) 363-4182

11.12 <u>Time is of the Essence</u>. The parties hereto acknowledge and agree that time is of the essence in connection with the execution, delivery and performance of this Agreement.

11.13 <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which will be an original as regards any Party whose name appears thereon and all of which together will constitute one and the same instrument. This Agreement will become binding when one or more counterparts hereof, individually or taken together, bear the signatures of all Parties reflected hereon as signatories.

[*Remainder of page intentionally blank.*]

IN WITNESS WHEREOF, the Parties hereto have executed this Asset Purchase Agreement effective as of the date first above written, on the date(s) indicated adjacent to their respective signatures below.

**SELLER**

THE JOLT COMPANY, INC.

Date signed: September 28, 2009    By: *Robert Clamp*

        Name: Robert Clamp
        Title: Chief Executive Officer

**PURCHASER**

PEMF PARTNERS LLC

Date signed: September 28, 2009    By: _____

        Name: _____
        Title: _____

16

## SCHEDULE 1 (PURCHASED CONTRACTS).

[List of Contracts]

## SCHEDULE 2 (PERMITTED ENCUMBRANCES)

[List of Permitted Encumbrances]

2

## SCHEDULE 3 (EXCLUDED INTANGIBLE ASSETS)

[List of Excluded Intangible Assets]

Doc 3371314 Ver 7