-------------------------------------------------------x

In re                                :         Chapter 11

                                    :

THE JOLT COMPANY, INC.,        :         Case No. 09-22531

                                    :

             Debtor.        :         Judge John C. Ninfo, II

-------------------------------------------------------x

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER, PURSUANT TO
11 U.S.C. § § 105(a), 363, 365, 503, AND 507 AND FEDERAL BANKRUPTCY
RULES 2002 AND 6004, 6006 AND 9014 (I) APPROVING BID PROCEDURES FOR
SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (II) SCHEDULING A
HEARING TO CONSIDER THE SALE AND APPROVING THE FORM AND
MANNER OF NOTICES; (III) ESTABLISHING PROCEDURES FOR ASSUMPTION
AND ASSIGNMENT OF CERTAIN CONTRACTS, INCLUDING NOTICE OF
<u>PROPOSED CURE AMOUNTS; AND (IV) GRANTING RELATED RELIEF</u>**

The Jolt Company, Inc. ("Jolt" or the "Debtor" or the "Seller"), the debtor and debtor in

possession in the above-captioned chapter 11 case, by and through its undersigned counsel, hereby

files this motion (the "Motion") pursuant to sections 105(a), 363, 365, 503, and 507 of title 11 of the

United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of an order (I) approving certain

bid procedures, which are attached hereto as <u>Exhibit A</u> (the "Bid Procedures"), for the proposed sale

of substantially all of the Debtor's assets (the "Assets") as set forth in that certain asset purchase

agreement (the "APA")[1] by and between the Debtor and Emigrant Capital Corporation ("Buyer"); (II)

scheduling a hearing (the "Sale Hearing") and approving the form and manner of notice of the

Auction and the Bid Procedures; (III) establishing procedures for the potential assumption and

assignment of certain executory contracts and unexpired leases (the "Contracts"), including notice of

proposed cure amounts; and (IV) granting related relief.  The facts and circumstances supporting this

---

[1] All capitalized terms shall have the meaning ascribed to them in the Bid Procedures unless otherwise defined herein.

Motion are set forth in the concurrently filed *Affidavit of Robert Clamp in Support of First Day Motions* (the "Clamp Affidavit").  In support of this Motion, the Debtor respectfully states as follows:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105, 363, and 365, 503 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.

## BACKGROUND

2.     Simultaneously herewith (the "Petition Date"), Debtor has filed with this Court its voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Pursuant to Sections 1107 and 1108 of the Bankruptcy Code, the Debtor is continuing to operate its business and manage its properties and assets as debtor in possession.  No trustee, examiner or committee of creditors has yet been appointed in this chapter 11 proceeding.

3.     The Debtor, which also conducts business as Wet Planet Beverages, was created in 1985 by C.J. Rapp.  When the Debtor was introduced over 20 years ago, it was the pioneer in the energized beverage category, which has served as the foundation for its rich brand equity.  The media attention surrounding Jolt Cola's 1985 introduction catapulted the brand into national awareness, as Jolt Cola captured the imagination of taste-makers, musicians and the entertainment industry. Within weeks of launch, Jolt Cola appeared on the David Letterman Show and was featured in USA Today, positioning Jolt Cola as an icon for energy-fueled lifestyles.  The extensive media coverage made quite an impression with consumers and, soon, drinking one's first Jolt Cola became a rite of passage

2

for young Americans. Among independent mid-sized energy brands, Jolt Cola is the longest lived, preeminent privately held brand in the $4.9 billion energy drink category.

4.      Currently the Debtor's products are sold throughout the United States, Canada and Europe. The Debtor sells its product directly to four leading retailers that provide over 12,000 points of sale through their national chain stores. The Debtor also utilizes a network of distributors reaching approximately 25,000 retail locations in the United States and Canada.

5.      The Debtor's officers include Robert Clamp, Katherine Butkevich, C.J. Rapp, and Lowell Patric.

6.      Mr. Clamp joined Jolt as its Chief Executive Officer ("CEO") in February of 2009. Mr. Clamp is currently also employed by the Boylan Bottling Company ("Boylan") under a Cost Sharing Agreement between Jolt and Boylan (the "Sharing Agreement"). Mr. Clamp has 29 years experience in the food and beverage industry, having previously served as the CEO of the Really Cool Food Company and also as senior manager for Nestle Waters North America, the Coca Cola Company and Proctor & Gamble. Mr. Clamp earned his Bachelor of Arts Degree in economics from Denison University.

7.      Ms. Butkevich joined Jolt in 2009, also pursuant to the Sharing Agreement, where she serves as The Debtor's Chief Financial Officer ("CFO"). Prior to joining Debtor, Ms. Butkevich was a Vice President at Emigrant Capital, and a Senior Vice President of Finance and Treasurer of Medsite, a venture backed pharmaceutical marketing firm. Ms. Butkevich also previously held a number of positions with GE Capital, including Team Leader of its Merchant Banking Group. Prior to joining GE, Ms. Butkevich was the Vice President of Strategic Planning at North Fork Bancorp

and a Manager at KPMG. Ms. Butkevich earned her Bachelor of Business Administration degree from the University of Miami and is licensed in New York as a Certified Public Accountant.

8.     C.J. Rapp ("Rapp"), the President and Founder of Jolt, developed the concept of a high energy soft drink, and in 1985, launched the first product offering, Jolt Cola. Mr. Rapp instituted a unique approach to marketing its products by creating a network of independent beer distributors to sell Jolt Cola, thus immediately developing a national distribution network without the need of regional bottler relationships. Mr. Rapp also developed the use of resealable cap cans for packaging the Jolt Cola product line and executed an exclusive Can Supply Agreement for such containers with Rexam Beverage Can Company ("Rexam"). Mr. Rapp earned his bachelor's degree from the State University of New York. In addition to his role as President of Debtor, Mr. Rapp serves on The Debtor's Board of Directors (the "Board").

9.     Mr. Patric, who joined Jolt in 2003, currently serves as Jolt's Chief Operations Officer ("COO"); however, he has also previously served Jolt as its CFO. Prior to joining Jolt, Mr. Patric was a business advisor and developed a successful financial consulting business. In addition to his role as COO, Mr. Patric is a member of the Board.

10.     In total, the Debtor's Board is made up of five members: (a) C.J. Rapp; (b) Lowell Patric; (c) Val Stalowir; (d) Kenneth Walters; and (e) John Sheppard. Kenneth Walters is the Senior Managing Director of Emigrant Capital Corporation ("ECC"), while Val Stalowir is an Executive Partner of ECC. As discussed below, ECC is one of the Debtor's prepetition senior secured creditors, the proposed lender of debtor-in-possession financing, and the affiliate of the proposed stalking horse bidder of the sale of substantially all of the Debtor's assets.

4

**Events Leading To Commencement Of The Debtor's Chapter 11 Case**

11.     In 2005, Rexam, the world's second largest aluminum beverage can supplier, in consultation with the Debtor, created the user-friendly, resealable cap can concept. The cap can was the first 23.5 oz. product in the market with a resealable closure, generating considerable attention. In the summer of 2008, the Company introduced a 16 oz. version of the resealable cap can, which was also the first of its kind in the market.

12.     Anticipating high sales of the 23.5 ounce version of the Jolt Cola product due to the Debtor's entrance into new markets, Rapp predicted sales of approximately 48 million cans per year, and thus entered into an exclusive supply agreement with Rexam (the "2007 Can Supply Agreement") for this anticipated production. According to the terms of the 2007 Can Supply Agreement, the Debtor was obligated to purchase 90 million 23.5 ounce resealable cans between January of 2007 and December of 2009 (the "Minimum Production"). The terms of the 2007 Can Supply Agreement further provides that the Debtor may be obligated to pay a capital reimbursement expense (the "Capital Reimbursement Expense") to Rexam in the event the Debtor does not reach the Minimum Production.

13.     The Board did not approve the 2007 Can Supply Agreement in its final form, and in fact, never in fact saw a final copy of the 2007 Can Supply Agreement until a dispute concerning the agreement arose in 2009.

14.     In 2007, and for most of 2008, the Debtor failed to meet its business plan. Commencing in the last quarter of 2008, as a result of the economic effects of the recession, the Debtor's sales started to slow. The Debtor sought additional liquidity by entering into an agreement with ECC for a new loan facility of $2.0 Million. This financing was in addition to, and subordinate

to, an existing line of credit the Debtor already had with Emigrant Business Credit Corporation ("EBCC").

15.     During 2009, the economic environment continued to weaken. The energy drink industry in particular, as its products are relatively more expensive than other beverage products, experienced even greater challenges.

16.     Under the 2007 Can Supply Agreement the Debtor was committed to purchasing resealable cans that cost three times the amount of non-resealable cans that make up a majority of the packaging in the energy drink category.  As a result of a downturn in growth in the energy drink industry from double digits to no growth between the second half of 2008 and the first part of 2009, major multi-billion dollar competitors of the Debtor began to fight for market share and growth by significantly lowering their prices.

17.     Typically, until the second quarter of 2009, energy drinks were sold to suppliers for a price of two for five-dollars.  As a result of the changing market conditions, the prices quickly dropped to two for three-dollars.

18.     In order to offset the impact of the economic environment on their operating performance, both Coca Cola ("Coke") and Pepsi Cola ("Pepsi"), competitors of the Debtor, significantly reduced their retail prices and increased their promotional efforts, which increased competition with the Debtor's product and further impacted the Debtor's sales.  By June of 2009 the Debtor's revenues were 50% below projections and 52% lower than revenues realized in the comparable prior year period.

19.     Additionally, Coke partnered with Monster, the second most popular energy brand, and Pepsi partnered with Rockstar, the third most popular energy brand, further accelerating the price

6

war.  The Debtor, which was unable to lower its pricing on the resealable cans, could no longer compete with the leading energy drinks on a value basis and still be profitable.

20.     In order for the Debtor to be competitive in the market, the company needs to launch a non-resealable package; however, with the current Rexam claims and asserted liabilities, it is unlikely that the Debtor can secure additional capital and pursue this strategy.

21.     As discussed above, under the terms of the 2007 Supply Agreement, the Debtor was required to purchase the Minimum Production of 90 million cans by December 31, 2009 or Rexam could assess a Capital Reimbursement Fee, calculated by Rexam to be approximately $2.1 Million. To date, the Debtor has purchased only 27 million cans required by the Minimum Production.

22.     The 2007 Can Supply Agreement also permits Rexam to sell unused production capacity and credit those sales to the Debtor's Minimum Production.  It is unclear whether Rexam appropriately credited sales towards the Debtor's Minimum Production.

23.     During the summer of 2009, a dispute arose with Rexam under the 2007 Can Supply Agreement.  Specifically, Rexam and the Debtor dispute whether appropriate credit has been given to the Debtor for sales of unused production capacity.   Additionally, Rexam claims to hold approximately 7 million cans, or the equivalent of $2 Million in inventory, produced at the Debtor's request.

24.     In early 2008, the Debtor retained William Blair & Company ("William Blair"), a middle market investment bank, to explore a possible sale (the "Potential Sale") or fundraising for the company.  Given the Debtor's worsening sales trends and unsuccessful launch of the 16 ounce resealable cans, William Blair advised that it would be unsuccessful in either selling the company or

raising additional capital. William Blair alternatively advised the Debtor to seek additional capital through friends and family of the company.

25.     In January 2009, ECC committed to a $2.0 Million tranche of debt financing; however, the company's performance continued to deteriorate and the planned turnaround and sales revenue as outlined by Mr. Rapp when he executed the 2007 Can Supply Agreement did not materialize. The Board again approached William Blair to evaluate the Debtor's funding options. William Blair again stated that the company's best source of funding would come from friends and family. Mr. Rapp sought additional funding; however he was unsuccessful in securing funding from any source.

26.     As a result of these and other issues, Rexam and various other key vendors terminated trade credit, further threatening the Debtor's liquidity. Certain members of the Debtor's Board contacted friends and family members seeking capital investments into the company; however, no additional capital sources were located.

27.     The Debtor is in default of its covenant under the EBCC working capital line, and has reached the availability limit on the line of credit with ECC making this filing necessary for the Company to obtain further financing. Further, ECC is unwilling to continue funding the Debtor while the dispute with Rexam remains unresolved. Despite efforts made by the Board, the Debtor's management and counsel, discussions with Rexam have reached an impasse.

### Review of Asserted Liens and Security Interests

28.     The senior management of the Debtor, in consultation with legal counsel, has reviewed and analyzed public filings to determine, among other things, the validity and priority of asserted liens and security interest.

8

29.     Upon such review and analysis, the Debtor has determined that, as of the Petition Date, EBCC has a first security interest in all of the Debtor's assets in the approximate amount of $160,000.  ECC has a subordinated senior security interest in all of the Debtor's assets in the approximate amount of $2.2 Million and Rexam appears to hold a junior secured interest in all of the Debtor's assets for the outstanding amount of $510,000.

## RELIEF REQUESTED AND REASONS THEREFOR

30.     By this Motion, the Debtor respectfully requests entry of an order (I) approving the Bid Procedures; (II) scheduling the Sale Hearing and approving the form and manner of notice of the Auction and the Bid Procedures; (III) establishing procedures for the potential assumption and assignment of certain Contracts (as defined below), including notice of proposed cure amounts; and (IV) granting related relief.

**A.     The Proposed Sale**

1.     As dicussed above, in light of the economic conditions and various funding and pricing issues discussed above, Debtor hired William Blair to begin investigating the Potential Sale.

2.     After a thorough review, William Blair advised Debtor that it was not saleable through a private sale.  Rather, William Blair recommended that Debtor should obtain additional funding from an existing secured lender or from friends and family of the company.

3.     After discussions with its existing secured lenders, the Board and ECC reached initial agreements regarding the Potential Sale in order to preserve the going concern value of the company.  As a condition to the sale, ECC required finality. The only way to achieve ECC's conditions was through the negotiation of an asset purchase agreement with ECC, pursuant to which ECC would credit bid the outstanding obligations of the Emigrant Entities, followed by an orderly sale of

substantially all of The Debtor's assets under section 363 of the Bankruptcy Code, subject to higher and better bids pursuant to a Bankruptcy Court approved auction process. This, the Consultant and the Board agreed, would attract other purchasers to bid at the Potential Sale.

31.     Therefore, Debtor, with the help of its counsel, prepared certain bid procedures (the "Bid Procedures") designed to attract potential bidders. As is further disclosed in the motion to approve the Bid Procedures, Debtor will begin marketing its assets immediately following the Petition Date, including placing advertisements in a national circulation of the Wall Street Journal and online with BevNet.com, as well as mailing direct notice to all known potential strategic buyers.

32.     Although the Debtor will consider all Bids submitted in accordance with the Bid Procedures, attached hereto as <u>Exhibit A</u>, it will favor bids that maximize the value of the estate. Further, the Debtor proposes to sell, assign and transfer title to the Assets free and clear of any Encumbrances, with such Encumbrances to attach to the net proceeds of the Sale, if any.

33.     Accordingly, concurrently with the filing of this Motion, the Debtor filed the *Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a), 363, 365 and Federal Bankruptcy Rules 2002, 6004, 6006 and 9014, (I) Approving Asset Purchase Agreement and Authorizing the Sale of Assets of Debtor Outside the Ordinary Course of Business; (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Interests and Encumbrances; (III) Authorizing the Assumption and Sale and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* (the "Sale Motion").

10

**B.      The Asset Purchase Agreement**

34.      On or about September 24, 2009, the Debtor entered into the APA with the Buyer under which the Buyer would acquire substantially all of the Assets.  A true and correct copy of the APA is attached to the Sale Motion filed concurrently herewith.

35.      The material terms of the APA are as follows:[2]

(a)      Purchased Assets to be Sold.  Upon the terms and subject to the conditions forth in this Agreement, effective as of the Effective Time, Seller shall sell, convey, assign, transfer and deliver to Purchaser, free and clear of all Encumbrances other than the Permitted Encumbrances and Purchaser shall purchase and acquire from Seller, Seller's right, title and interest in and to all of Seller's property and assets, real, personal or mixed, tangible and intangible, of every kind and description (but excluding the Excluded Assets):

(i)      all Equipment;

(ii)      all Inventory;

(iii)      all Accounts Receivable;

(iv)      all Purchased Contracts listed on Schedule 1;

(v)      all data and Records related to the operations of Seller, including financial and accounting Records, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and Records and, subject to Legal Requirements, copies of all personnel Records;

(vi)      all of the intangible rights and property of Seller, including any intellectual property rights and licenses, patents, trade marks, trade names and brands, know-how, trade secrets, recipes, liquor licenses and permits, good-will, telephone and telecopy numbers, and e-mail addresses, and websites except for such intangible rights as may be specifically excluded;

(vii)      all insurance benefits of Seller, including rights and proceeds, arising from or pertaining to the Purchased Assets or the Assumed Liabilities

---

[2]    This summary of the APA is provided for the Court's convenience only.  To the extent that the summary differs in any way from the terms of the APA, the terms of the APA shall control.  Capitalized terms used but not defined in this summary shall have the meanings given in the APA.

prior to the Effective Time, unless otherwise treated in accordance with this Agreement;

(viii)    all of Seller's claims for refunds of deposits to vendors and utility providers; and

(ix)    all claims of Seller against Third Parties relating to the Purchased Assets whether choate or inchoate, known or unknown, contingent or non-contingent; provided, however, that such claims shall not include any claims or causes of action arising under chapter 5 of the Bankruptcy Code ("Chapter 5 Claims") (together with (a)(i)-(a)(ix) the "Purchased Assets").

(b)    <u>Purchase Price</u>.  The purchase price for the Purchase Assets shall be $1,725,000 (the "*Purchase Price*"); *provided, however*, that Purchaser shall reserve the right to bid the entire amount of EBCC and ECC's Debt plus the DIP Debt.

(c)    <u>No Assumption of Other Liabilities</u>.  Purchaser shall not assume any other Liability of Seller arising prior to the Closing Date.  Liabilities for Taxes shall be prorated as of the Closing Date.

(d)    <u>Closing</u>.  Upon the terms and subject to the conditions of the Agreement, the closing of the Sale contemplated by the Agreement (the "Closing") shall take place at the offices of Benesch Friedlander Coplan and Aronoff, LLP, in Cleveland, Ohio, or such other place as the Parties may agree, commencing at 10:00 a.m. local time on the Tuesday following the satisfaction or waiver of all conditions to the obligations of the Parties to consummate the transactions contemplated hereby (other than conditions with respect to actions the respective Parties will take at the Closing itself) or such other date as Purchaser and Seller may mutually determine (the "Closing Date").  The Parties shall use their commercially reasonable efforts to consummate the transactions contemplated hereby within fifteen (15) days after the Bankruptcy Court has entered the Sale Order approving such sale to Purchaser.

(e)    <u>Conditions to Obligations</u>.  The obligations of the Seller and Buyer to consummate the transaction to be performed by them in connection with the Closing are subject to the satisfaction or waiver of various closing conditions contained in Articles 7 and 8 of the Agreement, which include but are not limited to the Bankruptcy Court entering the Bid Procedures Order and Sale Order.

Case 2-09-22531-JCN    Doc 13    Filed 09/28/09    Entered 09/28/09 13:24:19    Desc Main
Document     Page 12 of 21

(f)     Termination of Agreement.  The Agreement may be terminated at any time prior to the Closing as follows:

(i)     mutual written consent at any time prior to the Closing;

(ii)    Buyer giving written notice to Seller if: (A) the Bid Procedures Motion is not granted and an order thereon is not entered on or before October 20, 2009; (B) Anyone other than Buyer is declared by Seller or determined by the Bankruptcy Court to be the highest and best bidder or is otherwise selected as the purchaser of the Purchased Assets; (C) Seller has breached any material representation, warranty, or covenant contained in the Agreement in any material respect, Buyer has notified Seller of the Breach, and the Breach has continued without cure for a period of fifteen (15) days after the notice of Breach; (D) An order approving the Sale Motion has not been entered by the Bankruptcy Court on or before November 25, 2009; (E) Closing shall not have occurred on or before that date which is 30 days following the entry of the order granting the Sale Motion by reason of a failure of one of the conditions listed in Articles 7 or 8 of the Agreement (unless the failure results primarily from Buyer itself Breaching any representation, warranty, or covenant contained in the Agreement); or (F) Seller withdraws or otherwise ceases to prosecute entry of an order granting this Motion;

(iii)   Seller giving written notice to Buyer if: (A) Buyer has breached any material representation, warranty of the Agreement in any material respect, Seller has notified Buyer of the Breach, and the Breach has continued without cure for a period of fifteen (15) days after the notice of Breach; or (B) the Closing shall not have occurred on or before that date which is thirty-five (35) days after the date of entry of the Sale Order, by reason of the failure of any condition precedent under Sections 7 or 8 of the Agreement (unless the failure results primarily from Seller Breaching any representation, warranty, or covenant contained in this Agreement).

13

**C.    The Proposed Bid Procedures[3]**

36.    The Debtor desires to receive the greatest value for the Assets.  Therefore, in order to reach a broad pool of possible purchasers and to seize on possible sale opportunities before any declination in value, the Debtor believes that it is imperative that it promptly move forward with approval and implementation of the Bid Procedures.  Accordingly, the Bid Procedures (detailed on Exhibit A, annexed hereto) were developed consistent with the Debtor's need to expedite the sale process, but with the objective of promoting active bidding that will result in the highest and best offer the marketplace can sustain for the Assets.  Moreover, the Bid Procedures reflect the Debtor's objective of conducting the Auction in a controlled, but fair and open, fashion that promotes interest in the Assets by financially able, motivated bidders who are likely to close a transaction.

37.    The Debtor submits that implementation of the Bid Procedures will facilitate the bidding for the Assets.  The Debtor does not believe that at this juncture, given their available liquidity and the need to sell the Assets on an expedited basis, approval of the Bid Procedures will chill any bidding.  Quite to the contrary, approval of the Bid Procedures is in the best interests of the Debtor, its estate, and its creditors in that it provides a structure and format for all potentially interested parties to equally formulate a bid for the Assets and participate in the sale process.  Failure to approve the Bid Procedures may jeopardize a sale to the detriment of the Debtor's estate and creditors.

---

[3]    As noted below, to facilitate the Bid Procedures, the Debtor respectfully requests the Bid Deadline (as defined below) be no later than November 13, 2009 at 4:00 p.m. (ET), the Auction (as defined below) be scheduled for no later than

**D.      Notice of Sale Hearing, Auction, Bidding Procedures and Objection Dates**

38.      The Debtor seeks to have the Sale Hearing scheduled no later than November 25, 2009, with an objection deadline for such Sale Hearing set for 4:00 p.m. (ET) the day prior to the Sale Hearing.

39.      Not later than three (3) days after entry of the Order granting this Motion, the Debtor will serve the *Notice of Auction and Sale*, substantially in the form annexed hereto as <u>Exhibit B</u>, to be sent by first-class mail postage prepaid to (i) all entities that claim any interest in or lien on the Assets; (ii) all parties to Contracts (as defined below); (iii) all governmental taxing authorities that have, or as a result of the sale of the Assets may have, known claims, contingent or otherwise, against the Debtor; (iv) all parties that filed requests for notices under Bankruptcy Rule 2002; (v) all known creditors (whether liquidated, contingent or unmatured) of, and interest holders in, the Debtor; (vi) all known interested governmental, pension, and environmental entities, including but not limited to, the Office of the United States Attorney for the District of Delaware; (vii) the Office of the United States Trustee; and (viii) all entities that have, within the past 12 months, expressed to the Debtor, an interest in purchasing the Assets.

40.      Not later than ten (10) days after the entry of the Order approving this Motion, the Debtor shall cause the *Notice of Auction and Sale*, substantially in the form annexed hereto as <u>Exhibit B</u>, to be published in the national edition of The Wall Street Journal and online with BevNet.com, a trade site and magazine widely viewed by other high energy drink manufacturers and sellers, pursuant to Rule 2002(l).  Such publication notice shall be sufficient and proper notice to any other interested parties, including those whose identities are unknown to the Debtor.

---

November 20, 2009, and the Sale Hearing be scheduled, at the convenience of the Court, no later than November 25, 2009.

41.     Further, to facilitate the sale, assumption and assignment of any executory contracts and unexpired leases (collectively, the "Contracts"), the Debtor will serve, via first class mail, a notice (the "Cure Amount Notice"), similar to the form attached hereto as <u>Exhibit C</u> not later than three (3) days after the entry of an Order approving the Motion on each counterparty to the Contracts.

42.     The Debtor will attach to the Cure Amount Notice its calculation of the undisputed cure amounts that the Debtor believes must be paid to cure all prepetition defaults under the Contracts (the "Prepetition Cure Amounts").  If no amount is listed on the Cure Amount Notice, the Debtor contends that there is no Prepetition Cure Amount.  Unless the non-Debtor party to a Contract files an objection (the "Cure Amount Objection") to its scheduled Prepetition Cure Amount by 4:00 p.m. on the seventh day following service of the Cure Amount Notice, and serves the objection upon the Notice Parties, then the Debtor may assume and assign such Contract to the Buyer or the Successful Bidder, and such non-Debtor party shall (i) be forever barred from objecting to the Prepetition Cure Amount and from asserting any additional cure or other amounts owing with respect to such Contract, including, but not limited to, any defaults existing under such Contract and the Debtor, Buyer or such other Successful Bidder shall be entitled to rely solely upon the Prepetition Cure Amount; (ii) be forever barred and estopped from asserting or claiming against the Debtor, the Buyer, or such other Successful Bidder or any other assignee of the relevant Contract, that any additional amounts are due or defaults exists under such Contract, and (iii) be deemed to consent to the assumption and/or assignment of such Contract.

43.     In the event that a Cure Amount Objection is timely filed, the Cure Amount Objection (i) must set forth the basis for the objection, (ii) must set forth, with specificity, the amount the party

asserts as the Prepetition Cure Amount, and (iii) have attached to it appropriate documentation in support of the Prepetition Cure Amount.

44. Hearings on any Cure Amount Objections may be held (a) at the Sale Hearing; or (b) on such other date as the Debtor may designate, provided that if the subject Contract is assumed and assigned prior to such hearing, the cure amount asserted by the objecting party (or such lower amount as may be fixed by this Court) shall be deposited and held in a segregated account pending further order of this Court or mutual agreement of the parties.

45. The Debtor's decision to assume and assign a Contract is subject to Court approval and consummation of the Proposed Sale of the Assets. Absent consummation of the Proposed Sale of the Assets, each of the Contracts shall neither be deemed assumed nor assigned and shall in all respects be subject to further administration under the Bankruptcy Code.

46. Except to the extent otherwise provided in the APA or the agreement with the Successful Bidder, subject to payment of the cure amount determined by the Court (the "Cure Payment"), the assignee of any assumed Contract will not be subject to any liability to the assigned Contract counterparty that accrued or first arose before the closing date of the Proposed Sale of the Assets, and the Debtor shall be relieved of all liability accruing or arising thereafter pursuant to Bankruptcy Code § 365(k).

47. Objections, if any, to the relief requested in the Sale Motion, must: (a) be in writing; (b) comply with the Bankruptcy Rules and Local Bankruptcy Rules; (c) be filed with the Clerk of the Bankruptcy Court for the Western District of New York, Rochester, on or before 4:00 p.m. (ET) on the date prior to the Sale Hearing; and (d) be served so as to be received no later than 4:00 p.m. (ET) on the same day, upon: (i) Counsel to the Debtor, Benesch Friedlander Coplan & Aronoff LLP, 200

17

Superior Avenue, Suite 2300, Cleveland, Ohio 44114, Attention: William I. Kohn, Esq.; (ii) Emigrant Capital Corporation, Attn: Ed. Burns and Ken Walters, 6 E. 43rd, New York, NY 10017; and (iii) counsel to any statutory committee, if appointed (collectively the "Notice Parties"); provided however, if the Buyer is not the Successful Bidder and an alternative Successful Bidder is seeking to have certain Contracts assumed and assigned as part of an alternative transaction, the non-Debtor parties to such Contracts shall have until the Sale Hearing to raise objections under section 365(b)(1)(C) of the Bankruptcy Code. The failure of any person to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Motion or the Debtor's assumption and assignment of any Contract or the consummation of the Proposed Sale of Assets and performance under the APA (or any alternative agreement entered into with the Successful Bidder), including the transfer of the Assets free and clear of all liens, claims, encumbrances, and interests (other than permitted encumbrances provided for expressly in the APA or alternative purchase agreement entered into with the Successful Bidder).

48.     The Debtor requests that the Sale Hearing be held before this Court on or before November 25, 2009. The Sale Hearing may be adjourned, from time to time, without further notice to creditors or other parties-in-interests other than by announcement of said adjournment before this Court or on this Court's calendar on the date scheduled for said hearing.

49.     The Debtor requests that the Court approve the notices to be issued in connection with the Proposed Sale of the Assets substantially in the form of the notices attached hereto as Exhibits B and C.

18

## BASIS FOR RELIEF REQUESTED

50.     Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). As described above, approval of the Bid Procedures will greatly assist the Debtor in maximizing the value that it may obtain for the Assets. Consequently, the Debtor respectfully submits that granting the requested relief is "appropriate" under the circumstances.

51.     Once the Debtor articulates a valid business justification, "[t]he business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Ill. 1995) (citations omitted); *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

52.     Indeed, when applying the "business judgment rule," courts show great deference to the debtor's decision making. *See Summit Land Co. v. Allen* (*In re Summit Land Co.*), 13 B.R. 310, 315 (Bankr. D. Utah 1981). Thus, this Court should grant the relief requested in this Motion if the Debtor demonstrates a sound business justification therefore.

53.     The Bid Procedures are designed to encourage competitive bidding in an orderly manner to maximize value for the Debtor's estate for its creditors, customers and employees. The proposed procedures contain terms typical for a process through which a Sale of this nature is consummated, and the adoption of the Bid Procedures represents a sound exercise of the Debtor's business judgment.

19

54.     The Debtor has sound business justifications for seeking approval of the Bid Procedures at this juncture.  The Debtor believes it is in the best interests of its estate, creditors, customers and employees to commence an auction process immediately, as the Debtor has limited funding and resources and the Buyer has agreed to limited funding of the DIP Facility for a limited period of 60-days, conditioned upon the Debtor expeditiously moving towards a sale.  Without the funding from the DIP Facility the Debtor would be unable to operate through the conclusion of the proposed bidding process.  In addition, the Sale of the Assets provides a realistic means for the continuation of services for the Debtor's customers with minimal interruption and inconvenience. Absent a Sale, the Debtor may be forced to cease operations and wind down its affairs, leaving customers scrambling to find alternatives to the goods the Debtor provides.

55.     For these reasons, the Debtor has determined, based upon its business judgment, that the best option for maximizing the value of its estate for the benefit of creditors, customers, employees and other parties in interest is through a sale of the Assets pursuant to the Bid Procedures.

## NOTICE

56.     No trustee, examiner, or creditors' committee has been appointed in this chapter 11 case.  Notice of this Motion has been given to:  (a) the United States Trustee for this region, (b) the Debtor's twenty largest unsecured creditors; (c) Emigrant Business Credit Corporation; (d) Emigrant Capital Corporation; and (e) Rexam Beverage Can Company.  In light of the nature of the relief requested herein, Debtor submits that no other or further notice is required.

WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially in the form annexed as Exhibit A hereto: (A) approving the Bid Procedures; (B) scheduling the Sale Hearing and approving the form and manner of the notice of the Auction and Bid Procedures; (C)

20

establishing procedures for the potential assumption and assignment of the Contracts, including

notice of proposed cure amounts; and (D) granting such further and related relief as this Court deems

just and proper.

Dated:   September 28, 2009

Respectfully submitted,

/s/ *William I. Kohn*
William I. Kohn (NY No. 4442273)
Stuart A. Laven, Jr. (NY No. 4446720)
BENESCH, FRIEDLANDER,
  COPLAN & ARONOFF LLP
200 Public Square, Suite 2300
Cleveland, OH  44114-2378
(216) 363-4500 (Telephone)
(216) 363-4588 (Facsimile)
wkohn@beneschlaw.com
slaven@beneschlaw.com

*Proposed Counsel for The Jolt Company, Inc.,*
*Debtor and Debtor in Possession*

Doc 3567990  Ver 4